**DEMING v. McCLAUGHRY, Warden of U. S. Penitentiary. Ft. Leavenworth, Kan.**

(Circuit Court of Appeals, Eighth Circuit. February 10, 1902.)

No. 1,656.)

1. COURT-MARTIAL—REGULAR OFFICERS INCOMPETENT TO TRY VOLUNTEERS.
   Officers of the regular army are incompetent, under the seventy-seventh article of war, to try the officers or soldiers of the volunteer forces raised under the acts of April 22, 1898, and March 2, 1899 (30 Stat. 361, c. 187; Id. 977, c. 352).

2. WRIT OF HABEAS CORPUS—FUNCTION.
   The writ of habeas corpus is not available to review an erroneous judgment of a court having jurisdiction. But it is effective to challenge a judgment rendered by a court without jurisdiction, and to relieve the defendant from its effect.

3. COURT-MARTIAL—JURISDICTION—INDISPENSABLE CONDITIONS.
   A court-martial is a court of inferior and limited jurisdiction. Proof (1) that it was convened by an officer empowered by the statutes to call

it; (2) that the officers whom he commanded to sit upon it were of those whom he was authorized to detail for that purpose; (3) that the court thus constituted was vested with power to try the person and the offense charged; and (4) that its sentence was in conformity to the statutes,— is indispensable to its jurisdiction and to the validity of its judgment or sentence.

4. SAME—JUDGMENT AGAINST A VOLUNTEER BY A COURT-MARTIAL OF REGULAR OFFICERS WITHOUT JURISDICTION AND VOID.

No officer is authorized, but every officer is forbidden, to constitute of officers of the regular army a court-martial to try a volunteer, and the judgment of such a court-martial against a volunteer is without jurisdiction and void.

5. CONSTRUCTION OF STATUTES—OPINIONS OF OFFICERS OF OTHER DEPARTMENTS.

The opinions of officers of other departments of the government relative to the construction and effect of statutes intrusted to them to enforce deserve serious consideration, and may well lead the way to decisions where the statutes are ambiguous and their meaning doubtful. But it is a duty of the courts, which they may not renounce, to interpret legislation by their own judgments; and where the words of a statute are clear, and its meaning plain, these must prevail, notwithstanding the opposing opinions of officers of other departments of the government.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Kansas.

This is an appeal from an order of the circuit court, which denied the petition of Peter C. Deming for a writ of habeas corpus upon this state of facts: Deming was, on March 29, 1900, a captain in the subsistence department in the volunteer army of the United States. On that day William R. Shafter, a major general of the volunteer army, and a retired brigadier general of the regular army of the United States, ordered that a general court-martial, composed entirely of officers of the regular army, should convene "for the trial of Captain Peter C. Deming, assistant commissary of subsistence, U. S. volunteers." The court thus called sat, tried the appellant upon some charge, and sentenced him to dismissal from the service of the United States, and to confinement in the penitentiary for three years, and this sentence was approved by the secretary of war, and confirmed by the president of the United States. Deming is confined in the penitentiary at Leavenworth, Kan., under a mittimus based on this judgment. He avers that the sentence upon him is void, and that he is illegally deprived of his liberty, because Gen. Shafter, a retired officer of the regular army, had no authority to convene the court, and because the court-martial which condemned him was not regularly constituted or organized, in that it was composed entirely of officers of the regular army, who were expressly prohibited to hear or determine any charge against him, an officer of the volunteer army, under the seventy-seventh article of war (Rev. St. § 1342), which reads: "Officers of the regular army shall not be competent to sit on courts-martial to try the officers and soldiers of other forces except as provided in article seventy-eight."

John H. Atwood (William W. Hooper, on the brief), for appellant.

E. H. Crowder and Edward A. Rozier (George C. Hitchcock, on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The petitioner, Deming, was an officer of the volunteer force raised under the act of congress of March 2, 1899 (30 Stat. 977, c. 352). He was tried and convicted by a court-martial composed of officers of the

regular army. The seventy-seventh article of war declares that officers of the regular army are not competent to sit on courts-martial to try the officers and soldiers of other forces. The crucial question in this case is, was this volunteer army the same army as the regular army, or was it a different and supplemental army? Was this volunteer force raised under the act of 1899 the same force as the regular army, or was it one of the "other forces" of the United States within the intent and meaning of article 77? On a cursory reading of the article the question does not seem to be difficult, nor the true answer to it doubtful. And, were it not for the earnest and forceful presentation of their view by the learned counsel for the government, and for the fact that the general commanding the army under the advice of the judge advocate general has held that under the act of April 22, 1898 (30 Stat. 361, c. 187), and of March 2, 1899 (30 Stat. 977, c. 352), the volunteer force is the same force as the regular army, and that the officers of the latter may lawfully try the officers of the former (Circular 21, H. Q. A., June 30, 1898), that contention might not seem forceful. But the opinions of the officers of the executive department of a government relative to the construction of a statute whose execution has been intrusted to them justly command and should receive the careful consideration of the courts, and in doubtful cases they should be permitted to lead the way to their decisions. Their opinions ought not to be overruled or disregarded unless upon a deliberate and careful review of the decisions which they render it clearly appears that they are tainted with error. On the other hand, the decisions of these officers are not controlling or conclusive upon the courts. It is the function and duty of the judicial department of the government to construe its statutes and to declare their meaning. That duty the courts may not renounce or abandon to others, and in its discharge they must exercise their own independent judgments, guided only by the established principles of the law and the recognized canons of interpretation. While the opinions of the officers of the executive department of the government may be permitted to lead the way to the proper construction of ambiguous statutes intrusted to them to enforce, yet where the words of the acts are plain, and their meaning is clear, these must prevail. Hartman v. Warren, 76 Fed. 157, 162, 22 C. C. A. 30, 36, 40 U. S. App. 245, 254; Webster v. Luther, 163 U. S. 331, 342, 16 Sup. Ct. 963, 41 L. Ed. 179; U. S. v. Tanner, 147 U. S. 661, 663, 13 Sup. Ct. 436, 37 L. Ed. 321; Merritt v. Cameron, 137 U. S. 542, 11 Sup. Ct. 174, 34 L. Ed. 772; U. S. v. Graham, 110 U. S. 219, 3 Sup. Ct. 582, 28 L. Ed. 126; Swift, C. & B. Mfg. Co. v. U. S., 105 U. S. 691, 26 L. Ed. 1108.

Guided by these familiar and indisputable rules of law, the question whether the volunteer force raised under the act of 1899 was the same force as the regular army, or one of the "other forces" of the United States, within the meaning of article 77, will be considered. That article reads:

"Officers of the regular army shall not be competent to sit on courts-martial to try the officers or soldiers of other forces except as provided in article 78."

The exception in article 78 relates to the officers of the marine corps, and does not withdraw the appellant or the officers who tried him

113 F.—41

from the prohibition of the general rule announced in article 77. The provisions of the act of March 2, 1899, pertinent to the issue under consideration are these:

"That from and after the date of the approval of this act the army of the United States shall consist of * * * ten regiments of cavalry, seven regiments of artillery, twenty-five regiments of infantry," and appropriate officers, departments and corps. 30 Stat. 977, c. 352, § 1.

"That to meet the present exigencies of the military service, the president is hereby authorized to maintain the regular army at a strength of not exceeding sixty-five thousand enlisted men to be distributed amongst the various branches of the service, including the signal corps, according to the needs of each, and raise a force of not more than thirty-five thousand volunteers to be recruited as he may determine from the country at large, or from the localities where their services are needed, without restriction as to citizenship or educational qualifications, and to organize the same into no more than twenty-seven regiments organized as are infantry regiments of war strength in the regular army and three regiments to be composed of men of special qualifications in horsemanship and marksmanship to be organized as cavalry for service mounted or dismounted, * * * provided, further, that such increased regular and volunteer force shall continue in service only during the necessity therefor and not later than July 1st, 1901. All enlistments for the volunteer force herein authorized shall be for the term of two years and four months unless sooner discharged." 30 Stat. 977, § 12.

That the president shall have power to continue in service or to appoint by and with the advice and consent of the senate certain brigadier generals of volunteers and major generals of volunteers; "provided, that regular army officers continued or appointed as general officers or as field or staff officers of volunteers under the provisions of this act shall not vacate their regular army commissions." 30 Stat. 977, § 13.

That the president is authorized to appoint, with the advice and consent of the senate, officers of the volunteer staff, including 12 assistant commissaries of subsistence with the rank of captain. 30 Stat. 977, § 14.

That the officers and enlisted men of the volunteer army shall be mustered out of the military service of the United States and discharged as provided in the act of April 22, 1898, provided that enlisted men of volunteers who desire to remain in the military service may be transferred to and enlisted in the regular army. 30 Stat. 977, § 15.

It will not be unprofitable to briefly call to mind the course of the legislation, decision, and practice of the nation relative to the matter in hand prior to 1899 before entering upon the discussion of the question which that act and the seventy-seventh article of war present. The American articles of war of 1776 provided that "the officers and soldiers of any troops, whether minute men, militia, or others," should, when joined with the regular forces, be subject to be tried by courts-martial in like manner with the officers and soldiers in the regular forces, "save only that such courts-martial shall be composed entirely of militia officers of the same provincial corps with the offender." Davis, Military Law, p. 617. Section 6 of the act of May 2, 1792, reads in this way: "And be it further enacted, that courts-martial for the trial of militia shall be composed of militia officers only." 1 Stat. 264, c. 28. This provision was re-enacted in the act of Febru-

ary 28, 1795 (1 Stat. 424, c. 36), in the act of April 18, 1814 (3 Stat. 134, c. 82), and in the act of July 29, 1861 (12 Stat. 282, c. 25, § 5). From these acts it will be seen how uniformly the legislation and practice of the nation excluded the officers of the regular army from courts-martial to try the officers and soldiers of the militia. Not only this, but the act of April 10, 1806, which established the rules for the government of the armies of the United States, contained this article: "Art. 97. The officers and soldiers of any troops, whether militia or others, being mustered and in the pay of the United States, shall, at all times and in all places, when joined, or acting in conjunction with the regular forces of the United States, be governed by these rules and articles of war and shall be subject to be tried by courts martial in like manner with the officers and soldiers of the regular forces, save only that such courts martial shall be composed entirely of militia officers only." 2 Stat. 371. The fact will not be overlooked that under this article the officers of the regular forces were disqualified from trying the officers and soldiers of troops joined or acting in conjunction with the regular army, whether such troops were militia, volunteers, or others. This enactment remained unchanged until in 1874 the present article 77 took its place. Rev. St. p. 237; 18 Stat. 113, c. 333. During all this time the nation maintained a regular army, and from time to time the president was empowered by congress to raise volunteer forces to augment the strength of the regular force. Congress provided for the enlistment of volunteers in 1812 for the war with Great Britain (2 Stat. 676, c. 21), in 1836 for the Seminole war (5 Stat. 32, c. 80), in 1839 to protect the Maine boundary (5 Stat. 355, c. 89), in 1846 for the war with Mexico (9 Stat. 9, c. 16), and in 1861 for the war of the Rebellion (12 Stat. 268, c. 9; Id. 274, c. 17). No opinion of any court, or of any officer of the war department, rendered prior to June 27, 1898, to the effect that any of these volunteer forces was the same force as the regular army, or to the effect that the officers of the latter were competent to sit on courts-martial to try the officers of the former, either under the old article 97 or the present article 77, has been called to our attention. On November 19, 1863, Judge Advocate General Holt declared that "the words 'militia officers,' as employed in the ninety-seventh article of war, have been interpreted since the commencement of the Rebellion as synonymous, so far as the organization of courts-martial is concerned, with 'volunteer officers.' This construction undoubtedly accords with the spirit of the article, and in its practical enforcement the object of the rule is accomplished." In the practice of the department the officers of the regular army were not permitted to sit on courts-martial to try the officers or soldiers of the volunteer force. G. O. 53, Dept. East, 1864; G. O. 16, Dept. Missouri, 1864; C. C. M. O. 11, 13, 16, Dept. Kentucky, 1865. The unanimous opinion of the writers upon military law was that the volunteer army was one of the "other forces" than the regular army, and that the officers of the latter were prohibited from sitting on courts-martial to try the officers or soldiers of the former. Bénet, Military Law (Ed. 1866) p. 25; Winthrop, Abridgment of Military Law, 29; Winthrop, Military Law and Precedents (2d Ed.) 92; Da-

vis, Military Law, pp. 27, 496. The decisions of the courts had recognized the two forces as different,—the one as temporary, called forth by the exigency of the time, to serve during war or its imminence, and then to be dissolved into its original elements; the other as permanent and perpetual, to be maintained in peace and in war. U. S. v. Sweeny, 157 U. S. 281, 15 Sup. Ct. 608, 39 L. Ed. 702; U. S. v. Merrill, 9 Wall. 614, 19 L. Ed. 664; Kerr v. Jones, 19 Ind. 351; Wantlan v. White, Id. 470. The laws and the long-continued practice of a people evidence its public policy. Vidal v. Girard's Ex'rs, 2 How. 127, 197, 11 L. Ed. 205; U. S. v. Association, 58 Fed. 58, 69, 7 C. C. A. 15, 73, 19 U. S. App. 36, 54, 24 L. R. A. 73. The uniform course of legislation, decision, and practice upon the subject under consideration for more than a century establish the fact that it had become the public policy of the United States to prohibit the trial of the officers and soldiers of the volunteer force and of the militia by the officers of the regular army.

Nor is the reason for this legislation and action far to seek or difficult to discern. It was not, as suggested by counsel for the government, that the volunteers and militia were citizens of the states, and that their officers were generally commissioned by the governors. It lies deeper, and is more fundamental and potential. It is grounded in that cardinal principle of Anglo-Saxon jurisprudence that no man shall be tried or condemned save by the hearing and judgment of his peers; in that principle which inspired the rule that deprives judges of the power to try persons accused of heinous crimes in civil life, and remits their trial to the forum of their peers, the jury. The officers of the regular army are generally taught in their youth the laws that govern the regular force, that high regard for truth and honor and that prompt and exact obedience to orders which condition its high efficiency. The officers of the volunteers spend their earlier days without knowledge of military law, preparing for agricultural, mechanical, mercantile, or professional pursuits, unaccustomed to military discipline, and exempt from the controlling commands of superiors. The officers of the regular army make the discipline of that army, the preparation for war, and war itself the work of their lives. Their hopes and their aspirations are to excel in this, their chosen profession, and upon it they rely for their livelihood. The officers of the volunteers look to civil pursuits for their ultimate success and sustenance. They leave these pursuits for a few short months at the call of their country to subdue a rebellion against or to defeat an enemy of their nation. They seek not so much to discipline the army they join, and to prepare it for war, as to speedily conclude the war, restore peace, and return to their chosen pursuits. Their hopes and aspirations center, not in their temporary occupation, but in the pursuits they have left, and to which they are soon to return. More than all this, the officers of the regular army know the unwritten code of military thought and action, and the habit of the trained soldier's life, and know them so well that their practice is involuntary, while a neglect of them seems inexcusable. The officers of the volunteer force come to the army in ignorance of this code and custom. They have short time to learn or to practice them. Their invariable practice does

not always seem to them essential to the defeat of the enemy and a speedy peace, and the heinousness of a disregard of some of their requirements does not always impress them. So it is that the thoughts, actions, habits, and ambitions of the officers of the regular army differ widely from those of the volunteers. Many things in the life of the soldier seem vital to the former that have small importance in the eyes of the latter. Many military offenses seem heinous to the former that appear venal to the latter. Congressmen have not been ignorant of these facts. They have associated with, known, and honored the officers of the regular army. They have known their pride in their profession, in the efficiency of the regular force, and the abhorrence with which they have looked upon any breach of either the moral or the military law. They have known the volunteers. These have been their constituents and their friends. Many of the members of congress have been volunteers themselves. In the light of these facts, and with this knowledge, they have thought that the officers and soldiers of the volunteer force ought not to be tried by the officers of the regular army; and they have made and maintained for more than a century the legislation which has been quoted to carry that thought into effect.

This, then, was the situation when the act of April 22, 1898, under which a judge advocate general first held that officers of the regular army could lawfully sit on courts-martial to try the officers and soldiers of the volunteer force, was passed. The acts of congress had prohibited for nearly a century, and still expressly forbade it. The decisions and the practice of the officers of the war department interdicted it. The established policy of the nation inhibited it. In the light of this legislation, decision, and policy the acts of 1898 and 1899 must be read and construed. What was there in these acts to repeal the statutory inhibition and reverse the public policy of a century? The decisions, the policy, and the practice rested on the acts of congress, and certainly nothing less than an express repeal by that body of the plain inhibition of article 77, or such legislation as clearly shows the undoubted intention of congress to strike it down, ought to be permitted to withdraw it, and to reverse the policy and practice of so many years.

The first argument in support of the contention of the government that the acts of 1898 and 1899 have had this radical effect is that, while the volunteer army was one of the "other forces" than the regular army under article 77, prior to the act of 1898, that act made it the same force as the regular army, because it provides that the organized and active land forces of the United States shall consist of the army of the United States and of the militia of the several states when called into the service of the nation; that the regular army is the permanent military establishment, which is maintained in peace and war, and that the volunteer army is maintained only during the existence of war, or while war is imminent, and is raised and organized only after congress authorizes the president so to do. 30 Stat. 361, c. 187, §§ 2–4. They insist that this enactment declares that there were but two forces of the United States,—the army and the militia,—and that, as the regular army was one part of the former force and the volunteer army was

another part of the same force, the latter army could not, after this enactment, be one of the "other forces" than the regular army, under article 77. There are several reasons why this argument fails to convince. In the first place, there is no repeal, modification, or reference to the provisions of article 77 in this act or in the act of 1899. There is nothing in either of them to indicate that in considering or enacting this legislation congress intended to modify the terms or the effect of that article, and, as no such intention appears in the legislation, the conclusive presumption is that no such intention existed. Moreover, the care and emphasis with which the difference between the regular army and the volunteer army is maintained throughout the act of 1898 demonstrate the fact that it was the positive intention of congress to maintain the distinction between the two forces. Starting with the declaration that the active land forces shall consist of the army and the militia, that the regular army is the permanent military establishment and the volunteer army is the temporary force in which enlistments shall be for a term of two years, unless sooner terminated, it contains these significant provisions:

"Sec. 5. That when it becomes necessary to raise a volunteer army the president shall issue his proclamation stating the number of men desired.

"Sec. 6. That the volunteer army and the militia of the states when called into the service of the United States shall be organized under, and shall be subject to, the laws, orders and regulations governing the regular army.

"Sec. 7. That all organizations of the volunteer army shall be so recruited from time to time as to maintain them as near to their maximum strength as the president may deem necessary."

Sec. 8. That all returns and muster rolls of the volunteer army "shall be rendered to the adjutant general of the army and filed in the record and pension office of the war department."

"Sec. 9. That in time of war, or when war is imminent, the troops in the service of the United States, whether belonging to the regular or volunteer army or to the militia, shall be organized" into divisions of three brigades.

Section 10 relates to the staff officers.

Sec. 11. That the president is hereby authorized to appoint in the volunteer army "one major general for each army corps or division and one brigadier general for each brigade," and any officer so selected and appointed from the regular army shall be entitled to retain his rank therein.

"Sec. 12. That all officers and enlisted men of the volunteer army and of the militia of the states when in the service of the United States, shall be in all respects on the same footing as to pay, allowances, and pensions as that of officers and enlisted men of corresponding grades in the regular army.

"Sec. 13. That the governor of any state or territory may, with the consent of the president, appoint officers of the regular army in the grades of field officers in organizations of the volunteer army, and officers thus appointed shall be entitled to retain their rank in the regular army.

"Sec. 14. That the general commanding a separate department or a detached army is authorized to appoint from time to time military boards of not less than three nor more than five volunteer officers of the volunteer army to examine into the capacity, qualifications, conduct and efficiency of any commissioned officer of said army within his command."

These various sections are utterly inconsistent with the view that the volunteer army was made the same force as the regular army, and that all distinctions in the treatment and trial of the members of the two forces were stricken down by the casual enumeration of the active land forces of the nation in the first section of the act. If the volunteer army was the regular army, why the declaration in section 6 that

the volunteer army should be subject to the laws, orders, and regulations governing the regular army; in section 12, that the officers and enlisted men of the volunteer army should be on the same footing as men of corresponding grades of the regular army; and in section 13, that officers of the regular army commissioned as officers in the volunteer army should retain their rank in the former? These provisions are pregnant with significance. But section 14 places the purpose and intention of the lawmakers to maintain the established rule that the volunteer army was one of the "other forces" than the regular army within the meaning of article 77 and the law and the policy that their officers and soldiers should not be tried by the officers of the regular army beyond doubt or cavil. It provides for military boards to examine into the capacity, qualifications, conduct, and efficiency of officers of the volunteer army. But, in accordance with the then existing law and policy of the nation, it excludes from these boards all officers of the regular army, and directs that they shall be composed entirely of officers of the volunteer force. When the entire act of 1898 is carefully read and considered, it is found to contain no indication of any intention on the part of congress to modify the terms or the settled construction of article 77. On the other hand, it evidences a plain purpose to maintain the rule and policy which classified the volunteer army among the "other forces" than the regular army, and prohibited the officers of the latter from sitting on courts-martial to try the officers and soldiers of the former.

Another reason why the argument based upon the classification in the first section of this act is not persuasive is that it is fallacious. Stated in syllogistic form, it is: The land forces are composed of the army and the militia. The army is composed of the regular army and the volunteer army. Therefore the volunteer force is the regular force. When thus stated, the fallacy is apparent. The contention is based on the false assumption that every part of a military force is the same part as every other part; that every species of a genus is the same as every other species of that genus; that every class properly described by a generic term is the same class as every other class covered by that term. Illustrations make the fallacy plain. Oranges and apples are fruit, yet oranges are other fruit than apples. The Russians and Americans are people, and yet the white Americans are other people than the black Americans. The cavalry, infantry, and artillery of the regular army is a military force, and yet the cavalry and infantry are other forces than the artillery. So the regular army and the volunteer army, under the classification of 1898, constitute a force, and yet the volunteer army, both in fact and within the meaning of article 77, is another force than the regular army.

Again, even if the contention of counsel for the government were conceded, it would but serve to strengthen the position that the petitioner, who was commissioned under the act of 1899, was a member of other forces than the regular army. The argument rests entirely on the declaration of the act of 1898 that the army of the United States is composed of the regular army and the volunteer army, and that the land forces consist of the army and the militia. The act of 1899 contains no such classification, but, on the other hand, expressly declares

that the "army of the United States shall consist" of the cavalry, infantry, and artillery of the regular army; that the regular army may be temporarily increased to 65,000 men, and that the president may "raise a force of not more than thirty-five thousand volunteers." 30 Stat. 977, 979, c. 352, §§ 1, 12. The petitioner is one of these volunteers, and, if the effect of the classification of 1898 had been all that counsel claims, yet by the literal terms of the act of 1899 Deming was a member of another force than the regular army,—a member of the volunteer force.

Counsel for the government advance another argument in support of the contention that the volunteers, under the acts of 1898 and 1899, were not other forces than the regular army. It is that the law and the practice upon this subject during the war of the Rebellion were established to prevent state troops from being tried by the officers of the regular army; that the volunteers during that war were raised by the states, and officered by their governors; and that their regiments were designated by the names of the states from which they came, while the volunteers called under the acts of 1898 and 1899 were raised under a different system, were not so nearly assimilated to the militia, and that those received under the act of 1899 were not apportioned to or raised by the states, their regiments were not designated by the names of the states, but, like the regulars, they were enlisted from the country at large, their regiments took numbers supplemental to those of the regiments of the regular army, and their officers were appointed, not by the governors, but by the president. This contention, in our opinion, is based on a misconception of the real reason which inspired the legislation and the policy which for so many years has prohibited the trial of volunteers by regulars. That reason was, not that the volunteers were state troops and the regulars national troops, that the volunteers were raised by the states and their officers were appointed by the governors, while the regulars were raised by the nation and their officers were commissioned by the president. It was, as has been shown in an earlier part of this opinion, that the knowledge, training, habits, hopes, and ambitions of the officers of the regular army, who had devoted themselves for life to the discipline and efficiency of that force, necessarily conditioned their opinions of the heinousness of military offenses; and these opinions, this knowledge and training, these hopes and ambitions, differed so widely from those of the officers of the volunteer force, who came from civil life, for a limited time, ignorant of military law and of the customs and practices of a soldier's life, and anxious to speedily return to their civil occupations, that congress established the rule that the former should not be competent to sit on courts-martial for the trial of the latter. The reason of this rule applies to the volunteer force raised under the act of 1899 with as much force as to those raised during the war of the Rebellion.

Finally, it is contended that the provision of section 6 of the act of April 22, 1898, "that the volunteer army and the militia of the states when called into the service of the United States shall be organized under, and shall be subject to, the laws, orders and regulations governing the regular army," indicates that the volunteer army and the

militia are a part of the regular army, and hence the same force as that army, within the meaning of article 77. The enactment appears to us to demonstrate the contrary, and that because, if the volunteers and the militia were a part of the regular army, they were subject to the laws, orders, and regulations governing it, without a special declaration to that effect. A similar provision may be found in the act of July 22, 1861 (12 Stat. 269, c. 9, § 2), under which the volunteer forces for the war of the Rebellion were enlisted, and yet those volunteers were held to be other forces than the regular army.

The result is that when the acts of 1898 and 1899 were passed there was an article of war in force enacted by congress which expressly prohibited the officers of the regular army from sitting on courts-martial to try the officers or soldiers of other forces. Prior to the passage of these acts the volunteer force was in fact, and had been uniformly held to be, one of these other forces, so that in law and in practice this article of war forbade the officers of the regular army to try the officers or soldiers of the volunteers. There is no express repeal or modification of this inhibition in the acts of 1898 and 1899. There is nothing in these acts repugnant to or inconsistent with the prohibition, nothing to show that congress intended thereby to withdraw or to change it, but strong indications, in the marked distinction it studiously maintains between the regular army and the volunteer army, and in the fact that it provided for military boards composed entirely of officers of the volunteer army to examine into the efficiency and qualifications of the volunteer officers, that it intended to preserve and to maintain the inhibition. The reason which inspired this legislation and the policy and practice it evidences apply with all their cogency and force to the officers and soldiers of the volunteer force raised under the act of 1899. These facts and the considerations to which we have adverted have irresistibly forced our minds to the conclusion that the volunteer force raised under the act of 1899 was not the same force as the regular army, but that it was one of the "other forces" specified in article 77, and that the officers of the regular army were forbidden by that article to sit on any court-martial to try the petitioner, who was an officer of the volunteer force raised under the act of 1899.

It is insisted, however, that, if the members of this court-martial were disqualified to try the petitioner, that objection was waived, because not made at the trial, and the judgment was not void, but merely erroneous and voidable, so that it was impregnable to collateral attack by the writ of habeas corpus. A writ of habeas corpus cannot be made to perform the office of a writ of error, but it is the proper process to challenge a void judgment and to relieve the defendant from its baleful effect. It may not be invoked to review and avoid an erroneous judgment of which the court had jurisdiction, but it is always effective to relieve a prisoner from the restraint imposed by a judgment that is absolutely void. In re Reese, 47 C. C. A. 87, 107 Fed. 942, 948; Ex parte Buskirk, 72 Fed. 14, 21, 18 C. C. A. 410, 417, 25 U. S. App. 613, 615; Ex parte Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216; Ex parte Fisk, 113 U. S. 713, 718, 5 Sup. Ct. 724, 28 L. Ed. 1117; Dynes v. Hoover, 20 How. 81, 83, 15 L.

Ed. 838; Ex parte Reed, 100 U. S. 13, 23, 25 L. Ed. 538; In re Coy, 127 U. S. 731, 8 Sup. Ct. 1263, 32 L. Ed. 274; Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; U. S. v. Pridgeon, 153 U. S. 48, 59, 14 Sup. Ct. 746, 38 L. Ed. 631; Rose v. Roberts, 99 Fed. 948, 40 C. C. A. 199. A judgment or sentence of a court which had no jurisdiction of the subject-matter or of the person affected by its adjudication is absolutely void. But the judgment or sentence of a court empowered to hear and determine the issues relative to the subject-matter and the person affected by its decision, although it may be wrong and irregular, is simply voidable, and cannot be successfully attacked collaterally. Foltz v. Railroad Co., 60 Fed. 316, 318, 8 C. C. A. 635, 637, 19 U. S. App. 576, 581. Hence the question here presented is, did this court-martial have jurisdiction to hear and try the petitioner for the offense for which he was charged? The legal presumption is that courts of general jurisdiction have the power and the authority to make the adjudications which they render, and that their judgments are valid. But no such presumption accompanies the sentences of courts of inferior or limited jurisdiction. It is indispensable to the maintenance of their judgments that their jurisdiction shall be clearly and unequivocally shown. A court-martial is a court of limited jurisdiction. It is a creature of the statute, a temporary judicial body authorized to exist by acts of congress under specified circumstances for a specific purpose. It has no power or jurisdiction which the statutes do not confer upon it. The articles of war specify the officers who are empowered to convene these courts (articles 72, 73, 74, 81, 82), the officers who may compose them (articles 75, 76, 77, 78, 80), and the persons and charges which they are empowered to try (articles 77, 78, 80, 81, 82, 83). It necessarily follows that the jurisdiction of every court-martial, and hence the validity of each of its judgments, is conditioned by these indispensable prerequisites: (1) That it was convened by an officer empowered by the statutes to call it; (2) that the officers whom he commanded to sit upon it were of those whom he was authorized by the articles of war to detail for that purpose; (3) that the court thus constituted was invested by the acts of congress with power to try the person and the offense charged; and (4) that its sentence was in accordance with the Revised Statutes. The absence of any of these indispensable conditions renders the judgment and sentence of a court-martial coram non judice, and absolutely void, because such a judgment and sentence is rendered without authority of law and without jurisdiction. Runkle v. U. S., 122 U. S. 543, 546, 7 Sup. Ct. 1141, 30 L. Ed. 1167; Mills v. Martin, 19 Johns. 7, 30; Wise v. Withers, 3 Cranch, 331, 2 L. Ed. 457; Ex parte Watkins, 3 Pet. 193, 207, 7 L. Ed. 650; Dynes v. Hoover, 20 How. 65, 80, 15 L. Ed. 838.

Let us now measure the contention that the judgment of this court-martial, which condemned the petitioner to dismissal and imprisonment, was not void, but was merely irregular or erroneous, by these indisputable principles. The eighty-eighth article of war reads:

"Members of a court martial may be challenged by a prisoner, but only for cause stated to the court. The court shall determine the relevancy and

validity thereof and shall not receive a challenge to more than one member at a time."

The acts of congress make no provision for a challenge to the array, and point out no method whereby the question of the disqualification of all the members may be determined in the first instance by any.one but the members of the court themselves challenged one by one. It is said that a court-martial is like a jury; that the reviewing officer occupies the place of a judge; that the disqualification of a juror, if not suggested at the trial, is waived, and does not render the verdict void (Kohl v. Lehlback, 160 U. S. 293, 16 Sup. Ct. 304, 40 L. Ed. 432; Clark v. Van Vrancken, 20 Barb. 281; In re Voorhees, 6 Op. Atty. Gen. 206); and that the judgment of this court-martial ought not to be held void because all its members were incompetent to sit upon it. But in the essentials of the issue the analogy does not hold. The question of the qualification of triors arises in limine. It is to be determined before the trial commences. In the case of a trial by jury, the judge, not the jury, determines the qualifications of the jurors; while in a trial by a court-martial the members of the court must determine their own qualifications, and, if all the members are incompetent to sit in the court at all, how can they be competent to decide that they are either competent or incompetent to act there? Moreover, a jury decides nothing but questions of fact, while the members of a court-martial determine both the law and the facts. This argument by analogy is not persuasive. Indeed, the analogy between the judgment of a court-martial and the judgments of courts composed of disqualified judges is much closer. All the members of this court-martial were disqualified. It was a court of inferior—of limited—jurisdiction. Why should its judgment have more virtue than those of courts of general jurisdiction some of whose judges are incompetent to sit? Yet the general rule, supported by the great weight of authority, is that the judgments of such courts are void, and that neither waiver nor consent can give them validity. Case v. Hoffman, 100 Wis. 314, 356, 75 N. W. 945, 44 L. R. A. 728; Oakley v. Aspinwall, 3 N. Y. 547, 552; Low v. Rice, 8 Johns. 409; Clayton v. Per Dun, 13 Johns. 218; Edwards v. Russell, 21 Wend. 63; People v. Connor, 142 N. Y. 130, 133, 36 N. E. 807; Chambers v. Clearwater, *40 N. Y. 310, 314; Sigourney v. Sibley, 21 Pick. 101, 106, 32 Am. Dec. 248; Gay v. Minot, 3 Cush. 352; Hall v. Thayer, 105 Mass. 219, 224, 7 Am. Rep. 513; Railway Co. v. Summers, 113 Ind. 10, 17, 14 N. E. 733, 3 Am. St. Rep. 616; Ochus v. Sheldon, 12 Fla. 138; Chambers v. Hodges, 23 Tex. 112; Gains v. Barr, 60 Tex. 676, 678; Templeton v. Giddings (Tex. Sup.) 12 S. W. 851.

The insuperable objection, however, to the jurisdiction of this court-martial and to the validity of its sentence is that the officer who called it was not only unauthorized, but was positively forbidden by act of congress, to constitute it of the officers of the regular army, to detail these officers to sit upon it; and when these officers were so detailed they were in like manner prohibited from responding to the call and from becoming members of the court. The order convening the court-martial declared that the purpose of its call was "for the

trial of Captain Peter C. Deming, assistant commissary of subsistence U. S. volunteers," and it commanded nine officers of the regular army to meet and sit upon the court. The seventy-seventh article of war prohibited Gen. Shafter, who issued this order, from directing these officers to sit upon a court-martial to try this officer of the volunteer force, and forbade them to do so. The court was therefore illegally constituted. It did not have a single member upon it that the commanding officer had the power to direct to participate in the trial of the petitioner, or that could lawfully do so. "It was necessary to show that the court was legally constituted in order to gain jurisdiction of the persons and offenses of those who were to be tried before it." Mills v. Martin, 19 Johns. 33. "To give effect to its sentences, it must appear affirmatively and unequivocally that the court was legally constituted, that it had jurisdiction, that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law." Runkle v. U. S., 122 U. S. 556, 7 Sup. Ct. 1141, 30 L. Ed. 1167. In the army of the United States courts-martial derive their power—their jurisdiction—from the acts of congress. Neither the silence, the consent, nor the agreement of the parties can confer it if it is not granted by the statutes. This court-martial derived no power or jurisdiction from the acts of the congress of the United States, because it was constituted in direct violation of, and not in accordance with, them. It was therefore entirely without jurisdiction to try the petitioner, and its judgment against him was absolutely void.

The judgment below must accordingly be reversed, and the case must be remanded to the circuit court, with directions to issue the writ of habeas corpus, and to proceed in accordance with the views expressed in this opinion; and it is so ordered.