MEHLIN et al. v. ICE.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1893.)

No. 182.

1. EJECTMENT—DUE PROCESS OF LAW—CHEROKEE LAWS.
Stat. Cherokee Nation, c. 3, art. 19, § 154, as amended by Act Dec. 7, 1889, provides that when, in an action of ejectment, application is made for a writ of ejectment, the district clerk shall give the defendant 10 days' notice to show cause why the writ should not issue, and the clerk is authorized to determine upon the showing made whether the writ shall issue. Held, that this proceeding is sufficient to constitute due process of law, within the meaning of the federal constitution.

2. CHEROKEE NATION—JUDGMENTS—FEDERAL COURTS.
The proceedings and judgments of the courts of the Cherokee Nation in cases within their jurisdiction are on the same footing with those of the courts of the territories of the Union, and entitled to the same faith and credit; and hence, where a party in a federal court justifies an entry under such writ of ejectment, the sufficiency of the evidence before the clerk to justify its issuance cannot be inquired into.

3. SAME—COURTS—JURISDICTION—GENERAL APPEARANCE.
Where a person responds to the notice so issued, enters a general appearance, and defends the case on the merits, he thereby waives any exemption from the jurisdiction of the courts of the Cherokee Nation to which he, as a white citizen of the United States, may be entitled.

In Error to the United States Court in the Indian Territory.

Action of forcible entry and detainer by Joshua H. Ice against James G. Mehlin and others. There was judgment for plaintiff, and defendants bring error. Reversed.

Statement by CALDWELL, Circuit Judge:

On the 10th day of May, 1892, Joshua H. Ice, the plaintiff below, and the defendant in error in this court, brought an action of forcible entry and detainer in the United States court for the Indian Territory, against James G. Mehlin, John Ketchem, and Perry Potter, to recover the possession of 130 acres of land in the Cherokee Nation, and damages for the unlawful detention of the same. The defendants, among other defenses. pleaded in justification that they ousted the plaintiff from the premises in obedience to the order of the clerk of the district court of Cooweescoowee district of the Cherokee nation, and the command of the writ of possession duly issued by said clerk and placed in the hands of Edward Adair, sheriff of said Cooweescoowee district, for execution, and duly executed by him. The justification was pleaded with technical accuracy. The answer, and exhibits made part thereof, show that the defendant in error was occupying the premises in dispute at the time of the death of Lemuel P. Ketchem, a Cherokee Indian, and the owner thereof; that the plaintiff in error, James G. Mehlin, a citizen and member of the Cherokee Nation, was duly appointed administrator of the estate of Lemuel P. Ketchem, deceased, by the proper probate court of the Cherokee Nation, and duly qualified as such, and that, as such administrator, he was, under the laws of the Cherokee Nation, entitled to the possession of the premises; and that on the 22d day of December, 1890, the said administrator commenced an action in due form in the district court of said Cooweescoowee district of the Cherokee Nation, against the said Joshua H. Ice, to recover the possession of the premises. Upon filing the complaint, the clerk issued the following summons:

"Cherokee Nation, Cooweescoowee District.

"To any Lawful Officer, Greeting: You are hereby commanded to notify J. H. Ice to be and appear before the undersigned, clerk of the Cooweescoowee district, on the 20th day of January, 1891, and show cause, if any, why a writ of ejectment should not issue against him in favor of James Mehlin, as administrator, complainant, for a certain improvement, located two miles south of Alluwe, I. T., adjoining a place owned by J. E. Campbell, Cooweescoowee district, in the Cherokee Nation. Herein fail not to execute within the time, and return with the date of services thereon as the law requires. Given under my hand and seal of office this 22d day of December, 1890.

[Seal.]                           [Signed]  "H. H. Trott."
                    "Clerk of the Cooweescoowee District."

This summons was duly served on the defendant, Ice, and on the return day he appeared by his attorney, and filed the following motion:

"Before Hon. H. H. Trott, Clerk of Cooweescoowee District, C. N.

"James G. Mehlin vs. J. H. Ice.

"Comes now J. H. Akin, as attorney for defendant in the above case, and moves the court for a continuance in said case, and for cause says that said defendant, Ice, is sick in bed, and cannot possibly be present at this time; also on account of the absence of Henry Armstrong, by whom he expects to prove that the place in question belongs to said Armstrong, and that said defendant rented said place from him; that said Armstrong is detained for some reason unknown to affiant.

[Signed]                                    "J. H. Akin,
                "Attorney for Defendant and Henry Armstrong."

The defendant, Ice, also filed a lease from Armstrong, who was a Cherokee Indian, to himself, for the premises in dispute for the term of one year from January 19, 1891. The record of the proceedings before the clerk is as follows:

"Complaint for Writ of Ejectment.

"Proceedings in the case of James Mehlin vs. J. H. Ice.

"Before H. H. Trott, Clerk of Cooweescoowee District, Cherokee Nation, Ind. Ter. Court convened on January 20th, 1891, at 9 o'clock A. M. At first call defendant fails to answer, and case continued until 3 o'clock P. M. Second call, 3 o'clock P. M., defendant fails to answer. Court adjourned for one hour. Four o'clock P. M., convened according to adjournment. Motion filed by defendant for a continuance as shown in Doc. marked 'A,' Motion accepted by plaintiff with the understanding that Henry Armstrong be made a defendant in this suit. Case continued to Monday, January 26th, 1891. January 26th, 1891, 9 o'clock A. M., case called, and continued to 10 o'clock A. M. Ten o'clock A. M., both parties answer ready. Defendants enter a general denial to the 1st, 2d, and 3d allegations, and admit that Mr. Ice is a citizen of the United States. Court proceeded to hear testimony. Court adjourned to 2 o'clock P. M. Two o'clock P. M., convened according to adjournment. Evidence proceeded with. Five o'clock P. M., court adjourned to 9 o'clock A. M., January 27th, 1891. January 27th, 9 o'clock A. M., court convened according to adjournment. Evidence proceeded with. Twelve o'clock M., adjourned to 2 o'clock P. M. Two o'clock P. M., convened according to adjournment. Testimony closed at 3:35 P. M., and it was agreed by the attorneys to submit their argument in writing, and court agreed to answer on Friday, January 30th, 1891, at 9 o'clock A. M. January 30th, 1891, the clerk being unable to attend court, the decision was deferred until February 5th, 1891, 9 o'clock A. M. February 5th, 1891, case taken under consideration. After the arguments had been read, the court ruled in favor of plaintiff.

[Signed]                                      "H. H. Trott, Clerk of Court."

The testimony before the clerk was taken down in writing, and constitutes a part of the record sent up from that court. After finding and adjudging that the plaintiff was entitled to the possession of the premises, the clerk thereupon issued a writ, of which the following is a copy:

"Writ of Ejectment.

"Cherokee Nation, Cooweescoowee District.

"To any Lawful Officer, Greeting: You are hereby commanded to proceed without delay; and eject one J. H. Ice, together with his effects, from the possession of a certain improvement located two miles south of Alluwe, in Cooweescoowee district, Cherokee Nation, and place James H. Mehlin in possession of same, which will be in accordance with a preliminary investigation had by me, on the 26th day of January, 1891, in accordance with the provisions of an 'Act of the national council amending section 154, page 130, Compiled Laws, and approved December 7th, 189–. Herein fail not to execute and return. Given under my hand and seal of office this, the 5th day of February, 1891.                                      H. H. Trott.
[Seal.]                                      "Clerk of Cooweescoowee District."

This writ was executed by Edward Adair, sheriff of the district, assisted by the defendants, by removing Ice from the premises, and placing the defendant, James G. Mehlin, as administrator of the estate of Lemuel P. Ketchem, in possession thereof. Thereupon Ice brought this action, and upon the trial below recovered judgment for the possession of the premises, and $500 damages and costs, and the defendant sued out this writ of error.

The following is a copy of the statutes of the Cherokee Nation prescribing the mode of proceeding in such cases:

"Any person who may take or be in possession of any improvement without consent of the claimant or owner, such improvement not being abandoned, and a part of the public-domain, and any person who shall come into possession of or now be possessed of any farm, residence, or improvement of any kind, to hold the same for a limited time by virtue of an agreement made with the owner or prior legal possessor thereof, and who shall fail or refuse to vacate the premises, with his effects, whenever the owner or person with whom such agreement shall have been made shall demand possession thereof

according to the terms of such agreement, such owner or party to said agreement shall have the right to go before the clerk of the district, and make oath to the facts that he is the lawful owner of such improvement, that such improvement is held by an occupant against such owner's will and consent, and, either without any agreement with such owner in the first place, or with his consent to the occupancy thereof for a limited specified time, but which time has expired, and such occupant continues in unlawful possession, though possession has been demanded of him by the owner; whereupon the clerk shall issue a writ commanding the sheriff of the district to summarily eject such unlawful occupant from the premises in question, and to place the person making said affidavit in possession, which writ the sheriff shall execute and return without delay. This act shall be held to apply to all persons, lawful residents or not, of this nation, who may be or come into possession of any farm, residence, or improvement in this nation, either without contract with a citizen, or by and through a contract made to hold the same for a limited time. (Act approved December 4, 1877.)"

Amended as follows:

"Be it enacted by the national council, that section 154, art. 19, c. 3, be, and the same is hereby, amended so that before any writ of ejectment shall issue the district clerk shall be required, when application is made for a writ of ejectment, to notify the person of whom complaint is made, and give him at least ten days to show cause, if any, why the writ should not issue; and the district clerk is hereby authorized to determine and be competent to decide whether a writ shall issue, with justice to both parties, and in compliance with the laws of the Cherokee Nation. Be it further enacted, that all laws and parts of laws conflicting with this act are hereby repealed. Approved December 7th, 1889.

"J. B. Mayes, Principal Chief."

W. T. Hutchings, for plaintiffs in error.
S. O. Hinds and W. C. Jackson, for defendant in error.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

CALDWELL, Circuit Judge, (after stating the facts.) Whatever the defendants below did in the way of putting the plaintiff out of the possession of the premises was done in obedience to the command of the writ issued by the clerk of the district court of the proper district of the Cherokee Nation. If this was a valid process, it constitutes a complete defense to this action. The proceedings before the clerk which led up to the issuance of the writ were had after due notice to the defendant in that action, and conformed to the requirements of the statute law of the nation, and the writ was in due form. It is not claimed that the statute under which the proceedings were had conflicts with the constitution of the Cherokee Nation. Complaint is made that the mode of proceeding prescribed by the statute is too summary to be regarded as due process of law under the constitution of the United States. But it is very clear the act in no manner conflicts with that instrument. The proceedings are not so summary as the proceedings authorized in like cases by the statutes of some of the states. By the law of Arkansas, when a complaint is filed in case of forcible entry and detainer, it is made the duty of the clerk to forthwith issue a writ to dispossess the defendant, without any preliminary inquiry whatever into the truth of the complaint. Section 3351, Mansf. Dig.

Under the Cherokee statute the defendant is entitled to 10 days' notice to show cause before the clerk why the writ should not issue. The hearing before the clerk is preliminary and interlocutory, but it is a hearing that determines the question whether the writ shall issue before the final trial of the cause upon its merits in the district court. When, upon such preliminary inquiry, the clerk issues a writ of possession regular on its face, in a case over which the court has jurisdiction of the subject-matter and the person, such writ is a perfect protection to the officers and his assistants executing it. In a suit against the officer or his assistants for the execution of such a writ, the sufficiency of the evidence before the clerk to warrant that officer in issuing the writ cannot be inquired into. Erskine v. Hohnback, 14 Wall. 613.

In the brief of the learned counsel for the defendant in error it is said of the Cherokees that "their title to land is a mere title by occupancy, the title being in the United States," and it is intimated that in some other respects the Cherokee Nation is very much on the same plane of the Indian tribes generally, and that little or no faith and credit should be accorded to the proceedings of their courts.

The tenure by which the Cherokee Nation holds its lands, and its relation to the United States in other respects, are widely different from that of the ordinary Indian tribes. By the treaties between the United States and the Cherokee Nation of February 14, 1833, (7 Stat. 414,) and of December 29, 1835, (Id. 478,) the United States granted to the Cherokee Nation, in fee simple, the lands now occupied by the Cherokees. These treaties in terms stipulated that a patent should be issued by the United States to the Cherokee Nation for the lands thereby granted, and on the 1st day of December, 1838, a patent for the lands was issued by the president in execution of the obligations imposed upon the United States by these treaties, and the validity of this patent has been affirmed by the supreme court. Holden v. Joy, 17 Wall. 211–246; The Cherokee Trust Funds, 117 U. S. 288, 6 Sup. Ct. Rep. 718. The preamble to the treaty of 1835 shows that a chief consideration on the part of the Cherokees for selling their lands east of the Mississippi river to the United States was to secure a permanent home for themselves, "where," in the language of the treaty, "they can establish and enjoy a government of their choice, and perpetuate such a state of society as may be most consonant with their views, habits, and condition;" and, in furtherance of this object, the fifth article of that treaty provides that—

"The United States hereby covenant and agree that the lands ceded to the Cherokee Nation in the foregoing article shall in no future time, without their consent, be included within the territorial limits or jurisdiction of any state or territory. But they shall secure to the Cherokee Nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people, or such persons as have connected themselves with them: provided, always, that they shall not be inconsistent with the constitution of the United States and such acts

of congress as have been or may be passed regulating trade and intercourse with the Indians; and also that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission, according to the laws and regulations established by the government of the same."

The jurisdiction granted by this article was confirmed by the thirteenth article of the treaty of July 19, 1866, (14 Stat. 799,) which declares:

"* * * That the judicial tribunals of the nation shall be allowed to retain exclusive jurisdiction in all civil and criminal cases arising within their country in which members of the nation, by nativity or adoption, shall be the only parties, or where the cause of action shall arise in the Cherokee Nation, except as otherwise provided in this treaty."

The right of local self-government has always been claimed and exercised by the Cherokee Nation, and their rights in this regard, so far as relate to their own country and people, have never been questioned by the United States. Nor is it true that the United States has always denied to the Cherokees jurisdiction over white intruders in their country. By article 8 of the treaty of July 2, 1791, (7 Stat. 46,) it was provided:

"If any citizen of the United States, or other person not being an Indian, shall settle on any of the Cherokee lands, such person shall forfeit the protection of the United States, and the Cherokees may punish him or not, as they please."

What modification of this particular jurisdiction has been made by subsequent treaties we need not inquire. The article has historical interest, as showing that more than a century ago the United States withdrew its protection from white intruders in the Cherokee country, and left their punishment to the Cherokees. This treaty had the approval of Washington. It is quite obvious that the jurisdiction it conferred on the Cherokees could only have been granted on the assumption that they were then a civilized people, having an established government of their own, and that their laws and modes of trial were of a character which made it proper to subject to their jurisdiction citizens of the United States settling upon their lands. It is very clear no such jurisdiction would have been granted to a savage or uncivilized tribe of Indians.

The social and political condition of the Cherokee Nation is imperfectly understood by many. By intermarriage with the whites, they have to a considerable extent come to be of mixed blood. Generations ago they abandoned the chase and the war path, and adopted the pursuits of civilized man. As far back as 1827 they adopted a written constitution, modeled after the constitutions of the states then surrounding their country. Their state of civilization at that time may be inferred from the following provisions of the constitution:

"No person who denies the being of a God, or a future state of rewards and punishment, shall hold any office in the civil department of this nation."

"Religion, morality, and knowledge being necessary to good government, the preservation of liberty, and the happiness of mankind, schools and the

means of education shall forever be encouraged in this nation." Sections 2, 10, art. 6, Const. 1827.

These articles were retained in the constitution adopted in 1839. In furtherance of the article on the subject of education the national counsel has, from' time to time, passed laws to establish and maintain common schools and seminaries in the nation, and their opportunities for religious instruction have not been at all inferior to those of the frontier white settlements. Under their constitution, the government, like that of the states, is divided into three departments,—legislative, executive, and judicial,—and the functions and jurisdiction of each of these departments is as well defined as it is in the constitutions of the states. Their judicial system is also modeled after that of the states, and business is conducted in their courts in the same orderly manner.

The title given to the executive head of the nation by its constitution has, doubtless, contributed to the erroneous impression that the Cherokees are not yet civilized. The term "chief," when used in connection with Indians in this country, is commonly understood to mean the head man of an uncivilized or semicivilized tribe of Indians; and the title of "principal chief," bestowed by the Cherokee constitution on the executive head of the nation, has undoubtedly done much to create the impression that the Cherokee people and their institutions resemble more nearly a tribe of uncivilized or semicivilized Indians than the people and institutions of a civilized state. But under the Cherokee constitution the powers and functions of the principal chief are precisely those of a governor of a state, and he is not empowered to perform, and is not expected to perform, any executive function which the governor of any state might not appropriately perform.

The nature and character of the Cherokee Nation as a political body, and the faith and credit due to the proceedings and judgments of its courts, have been the subject of consideration by the supreme court. The probate court of the Cherokee Nation issued letters of administration to Mackey and two others on the estate of Samuel Mackey, of the Cherokee Nation. In the case of Mackey v. Coxe, 18 How. 100, it became necessary to determine the validity of these letters, and the faith and credit due to them, and the court said:

"The Cherokees are governed by their own laws. As a people they are more advanced in civilization than the other Indian tribes, with the exception, perhaps, of the Choctaws. By the national council their laws are enacted, approved by their executive, and carried into effect through an organized judiciary. Under a law 'relative to estates and administrators' letters of administration were granted to the persons above named on the estate of Samuel Mackey, deceased, by the probate court, with as much regularity and responsibility as letters of administration are granted by the state courts of the Union. * * * A question has been suggested whether the Cherokee people should be considered or treated as a foreign state or territory. The fact that they are under the constitution of the Union, and subject to acts of congress regulating trade, is a sufficient answer to the suggestion. They are not only within our jurisdiction, but the faith of the nation is pledged for their protection. In some respects they bear the same relation to the federal government as a territory did in its second grade of government under

the ordinance of 1787. Such territory passed its own laws, subject to the approval of congress; and its inhabitants were subject to the constitution and acts of congress. The principal difference consists in the fact that the Cherokees enact their own laws under the restriction stated, appoint their own officers, and pay their own expenses. This, however, is no reason why the laws and proceedings of the Cherokee territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other territories in the Union. It is not a foreign, but a domestic, territory,—a territory which originated under our constitution and laws. * * * No question could arise as to the validity of the Cherokee law under which letters of administration were granted on the estate of Mackey, and, as the power of attorney given by the administrators to Raines seems to have been duly authenticated and proved, a payment to the administrator by the government would have been a legal payment. The Cherokee country, we think, may be considered a territory of the United States, within the act of 1812. In no respect can it be considered a foreign state or territory, as it is within our jurisdiction, and subject to our laws."

The general doctrine of this case has been affirmed in later cases. Holden v. Joy, supra; The Cherokee Trust Funds, supra. The proceedings and judgments of the courts of the Cherokee Nation in cases within their jurisdiction are on the same footing with proceedings and judgments of the courts of the territories of the Union, and are entitled to the same faith and credit.

But it is said, conceding this to be so, and conceding that the district court of the nation had jurisdiction of the subject-matter of the suit of Mehlin v. Ice, that it did not have and could not acquire jurisdiction over the person of Ice, because he was a white man, and a citizen of the United States, and that its proceedings are, for that reason, a nullity. There is a conclusive answer to this contention. Ice was notified to appear before the clerk, and show cause why he should not be put out of the possession of the premises. In response to this summons he entered a general appearance. He did not challenge the jurisdiction of the court over the subject-matter of the suit or over his person. He rested his right to the possession of the premises on a lease from Armstrong, and exhibited the lease, and asked that Armstrong be made a party defendant, which was done. Conceding that Ice, being a white man, was for that reason not subject to the jurisdiction of the courts of the nation, this was a personal privilege, which he might and did waive. The eleventh amendment to the constitution of the United States declares the judicial power of the United States shall not extend to a suit against a state, but it has always been held that the immunity from suit granted by this article is a personal privilege, which the state may waive at pleasure; and when it does waive its privilege, and voluntarily submits to the jurisdiction of a United States court, it is concluded by the judgment. Beers v. State of Arkansas, 20 How. 527; Clark v. Barnard, 108 U. S. 436–447, 2 Sup. Ct. Rep. 878; Cunningham v. Railroad Co., 109 U. S. 446–451, 3 Sup. Ct. Rep. 292, 609. The denial of jurisdiction to the Cherokee courts over white men in the Cherokee country is not any broader, and is not founded on as high considerations of public policy, as the denial to the courts of the United States of jurisdiction over the states. A party may waive any

provision either of a constitution, treaty, or statute intended for his benefit. It is therefore competent for a white man to waive the treaty and statutory stipulations exempting him from the jurisdiction of the Cherokee courts; and when he enters a general appearance to an action pending in those courts, and pleads to the merits, and there is a trial upon such plea, he thereby waives the exemption, and submits himself to the jurisdiction of the court, and will not afterwards be heard to contest the validity of the proceedings and judgment of the Cherokee court upon the ground that it had no jurisdiction of his person. Shutte v. Thompson, 15 Wall. 151; Shields v. Thomas, 18 How. 253; Jones v. Andrews, 10 Wall. 327; Bank v. Okely, 4 Wheat. 235; U. S. v. Rathbone, 2 Paine, 578; Hawes, Jur. §§ 9--11; Brown, Jur. §§ 49, 50; Bostwick v. Perkins, 4 Ga. 50; In re Cooper, 93 N. Y. 507; State v. Polson, 29 Iowa, 133; State v. Fooks, 65 Iowa, 196, 452, 21 N. W. Rep. 561, 773; Railway Co. v. McBride, 141 U. S. 127, 11 Sup. Ct. Rep. 982. The conclusion reached on this branch of the case renders it unnecessary to consider the other assignments of error.

The judgment of the court below is reversed, and the cause remanded for a new trial.