BUSTER et al. v. WRIGHT, United States Indian Inspector, et al.

(Circuit Court of Appeals, Eighth Circuit. March 7, 1905.)

No. 2,147.

**1. CREEK NATION—PERMIT TAX—CHARACTER—VALIDITY.**

The permit tax of the Creek Nation is the annual price fixed by its laws for the privilege of conducting business within its borders which it offers to noncitizens. The payment of the tax conditions the exercise of the privilege; but the latter, and hence the former, is optional with each noncitizen.

Prior to the Creek agreement of March 1, 1901, this tax was valid, and the Secretary of the Interior, the Indian inspector, and Indian agent had authority to enforce the laws which prescribed it.

**2. EXECUTIVE OFFICERS—DUTY TO ENFORCE LAWS—NECESSITY OF WRIT OR PROCESS.**

The duty of enforcing laws is primarily imposed upon executive officers. Such officers charged with the duty of enforcing an injunctive law may prevent, without other writ or process than the law itself and their commissions of office, and it is their first duty to prevent, its violation where they can do so without infringing the rights of those who threaten to break it, and no man has any personal or property right to violate a valid law. It is only when executive officers renounce or fail to discharge their primary duty in such a case that an appeal to the courts to enforce such a law may be successfully made.

**3. SAME.**

The rule of an executive department may be due process of law. A lawful rule made by the chief of an executive department to which the enforcement of a law is intrusted, which appoints a subordinate for the purpose, and imposes upon him the duty of enforcing the law, is sufficient process of law to authorize him to prevent its violation in cases where he can do so without infringing upon any personal or property right of those who threaten to break it.

**4. CREEK NATION—PERMIT LAWS—SECRETARY OF THE INTERIOR AND INDIAN AGENT MAY PREVENT UNLAWFUL BUSINESS OF NONCITIZEN IN ORDER TO ENFORCE THEM.**

The legal effect of the laws of the Creek Nation prescribing permit taxes is to prohibit noncitizens from conducting business in that nation without paying them.

The Secretary of the Interior and his subordinates, the Indian inspector and Indian agent, may lawfully close the business of noncitizens within that nation who refuse to pay their permit taxes, and prevent the continuance of that business until they are paid, for the purpose of preventing the continuous violation of those laws.

**5. SAME—NOT AVOIDED BY CREEK AGREEMENT OF MARCH 1, 1901.**

Neither the Creek agreement ratified by the United States March 1, 1901 (chapter 676, 31 Stat. 861, 866, §§ 10–16), nor the establishment of town sites within the territory of that nation, nor the sale of lots therein to occupants who were not citizens of that nation, nor the organization of towns and cities thereon, withdraws such town sites, lots, their purchasers or occupants, from the territorial or governmental jurisdiction of the Creek Nation, or exempts them from its laws, or withdraws them from the jurisdiction and authority of the Secretary of the Interior and his subordinates to close the unlawful business of those noncitizens who refuse to pay their permit taxes, for the purpose of preventing the continued violation of the laws which prescribe them.

**6. SAME—NOT AVOIDED BY ACT PROHIBITING DEPORTATION FROM INDIAN TERRITORY.**

The provision of the act of May 27, 1902 (chapter 888, 32 Stat. 259), which prohibits the deportation of persons in lawful possession of land

in any town site in any town or city in the Indian Territory, was not intended to and it did not repeal or annul the permit laws of the Creek Nation, nor withdraw from the Secretary of the Interior and his subordinates their authority to close the business of noncitizens who refuse to pay their permit taxes, in order to prevent the continuance of a violation of those laws.

7. PRACTICE—FORMER DECISION OF INFERIOR APPELLATE COURT—LAW OF CASE.

The former decision and decree of the Court of Appeals of the Indian Territory, which was not then reviewable because it was not final, is not the law of the case in this court upon an appeal from a subsequent final decree, which first presents to this court for review all the proceedings of the case from its inception.

8. APPEAL—A RIGHT DECREE ENTERED FOR A WRONG REASON.

Where a former decision of an inferior court erroneously reverses the dismissal of a bill upon a demurrer to it, and, after answer, upon the same facts, the final decree of the same court affirms such a dismissal, that decree should not be reversed, because it is in legal effect the decree which should have been affirmed upon the demurrer to the bill. A right decree for a wrong reason is not reversible.

(Syllabus by the Court.)

Appeal from the United States Court of Appeals in the Indian Territory.

For opinion below, see 82 S. W. 855.

This is an appeal from a decree of the United States Court of Appeals for the Indian Territory, which affirmed a dismissal for want of equity of a suit brought by C. W. Buster and others, who were not citizens of the Creek Nation, to prevent J. George Wright, Indian inspector of the Indian Territory, J. Blair Shoenfelt, the Indian agent for the Union agency, Guy P. Cobb, the tax collector for the Creek Nation, and John West, Indian police, officers of the United States, from stopping the business of the complainants, and from reporting them for deportation from the Indian Territory unless they paid the taxes for the privilege of doing business within the Creek Nation prescribed by the laws of the Creeks. Their bill was filed on August 23, 1901. They alleged in it that they were merchants in the town of Wagoner; that the defendants had demanded of them payment of their permit taxes prescribed by the laws of the Creek Nation, and had threatened to close their places of business, and to report them to the Secretary of the Interior for removal from the territory, unless they paid them; that they had stocks of merchandise; that they would suffer irreparable injury if their places of business were closed; that by the terms of the Creek agreement of March 1, 1901, the lands within the corporate limits of the town of Wagoner had been set apart for a town site, had been surveyed, platted, and appraised; that they resided in this town; that they were the owners and occupants of the improvements in which they were doing business; that the land upon which these improvements were located had been appraised and listed to them for purchase, and that they intended to buy it. The prayer of their bill was for an injunction against the defendants to prevent the performance of the acts they threatened.

A demurrer to this bill was sustained, and the bill was dismissed. The decree of dismissal was reversed by the Court of Appeals of the Indian Territory, and the case was remanded for farther proceedings. Upon the filing of the mandate the defendants answered that in the year 1900 the national council of the Creek Nation passed an act which was approved by the President of the United States, and which provided that all persons who were not citizens of the Creek Nation who wished to engage in business therein should pay to the United States Indian agent at Union agency, for the benefit of the Creek tribe, the annual permit taxes which were there specified, quarterly in advance, except where those taxes were based upon the cost of goods offered for sale; that in the case of goods offered for sale the tax should

be one-half of 1 per cent. of the first cost of all goods thus offered; that the Secretary of the Interior, on November 4, 1898, made and published certain rules regarding the collection of revenues in the Indian Territory, section 13 of which provided that it should be the duty of the Indian agent to collect, under the supervision of the United States Indian inspector for the Indian Territory, all rents, permits, revenues, and taxes of whatever kind or nature that might be due or payable to the Creek Nation; that the Attorney General of the United States had informed the secretary in September, 1900, that it was his duty to remove all persons from that nation who were members of classes forbidden by treaty or law, and who were without permit or license, and to close all business which required a license that was being carried on there without one; and that the defendants, under the acts of Congress and the treaties of the United States, and pursuant to the regulations and direction of the Secretary of the Interior, were proceeding to prevent the complainants from continuing to carry on their business in the Creek Nation without paying the permit taxes required by the laws of that nation for the exercise of that privilege.

After the filing of this answer the parties stipulated that the averments of the bill were true, and the case was submitted to the trial court for decision upon the bill, the answer, and this stipulation. That court again dismissed the bill, and that decree of dismissal was affirmed upon appeal by the Court of Appeals of the Indian Territory. Buster v. Wright, 82 S. W. 855.

Napoleon B. Maxey, Thomas H. Owen, and William T. Hutchings, for appellants.

David P. Dyer, for appellees.

Before SANBORN, Circuit Judge, and PHILIPS and RINER, District Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The permit tax of the Creek Nation, which is the subject of this controversy, is the annual price fixed by the act of its national council, which was approved by the President of the United States in the year 1900, for the privilege which it offers to those who are not citizens of its nation of trading within its borders. The payment of this tax is a mere condition of the exercise of this privilege. No noncitizen is required to exercise the privilege or to pay the tax. He may refrain from the one and he remains free from liability for the other. Thus, without entering upon an extended discussion or consideration of the question whether this charge is technically a license or a tax, the fact appears that it partakes far more of the nature of a license than of an ordinary tax, because it has the optional feature of the former and lacks the compulsory attribute of the latter.

Repeated decisions of the courts, numerous opinions of the Attorneys General, and the practice of years place beyond debate the propositions that prior to March 1, 1901, the Creek Nation had lawful authority to require the payment of this tax as a condition precedent to the exercise of the privilege of trading within its borders, and that the executive department of the government of the United States had plenary power to enforce its payment through the Secretary of the Interior and his subordinates, the Indian inspector, Indian agent, and Indian police. Morris v. Hitchcock, 194 U. S. 384, 392, 24 Sup. Ct. 712, 48 L. Ed. 1030; Crabtree v. Madden, 4 C. C. A. 408, 410, 413, 54 Fed. 426, 428, 431; Maxey v. Wright, 3 Ind. T. 243, 54 S. W. 807;

Maxey v. Wright, 44 C. C. A. 683, 105 Fed. 1003; 18 Opinions of Attorneys General, 34, 36; 23 Opinions of Attorneys General, 214, 217, 219, 220, 528. The executive department of the government of the United States is proceeding pursuant to these decisions and opinions to prevent noncitizens of the Creek Nation from exercising this privilege of trading within the borders of that nation without paying the permit taxes by closing their places of business in cases in which they refuse to pay them, and the complainants ask the courts to stay the hands of the officers of that department by their writs of injunction. They contend that all the authority of the Creek Nation to charge noncitizens who have purchased lots in town sites within that nation under the provisions of the Creek agreement ratified by the United States on March 1, 1901, permit taxes for the privilege of trading upon those lots or sites and all the power of the executive department of the United States to prevent such noncitizens from thus trading without the payment of these taxes have been withdrawn by the Creek contract of March 1, 1901 (chapter 676, 31 Stat. 861, 866, §§ 10–16), and by the provision of the act of May 27, 1902, making appropriations for the Indian Department, that "it shall hereafter be unlawful to remove or deport any person from the Indian Territory who is in lawful possession of any lots or parcels of land in any town or city in the Indian Territory which has been designated as a town site under existing laws and treaties" (chapter 888, 32 Stat. 259). It may not be unwise, before entering upon the discussion of this proposition, to place clearly before our minds the character of the Creek Nation and the nature of the power which it is attempting to exercise.

The authority of the Creek Nation to prescribe the terms upon which noncitizens may transact business within its borders did not have its origin in act of Congress, treaty, or agreement of the United States. It was one of the inherent and essential attributes of its original sovereignty. It was a natural right of that people, indispensable to its autonomy as a distinct tribe or nation, and it must remain an attribute of its government until by the agreement of the nation itself or by the superior power of the republic it is taken from it. Neither the authority nor the power of the United States to license its citizens to trade in the Creek Nation, with or without the consent of that tribe, is in issue in this case, because the complainants have no such licenses. The plenary power and lawful authority of the government of the United States by license, by treaty, or by act of Congress to take from the Creek Nation every vestige of its original or acquired governmental authority and power may be admitted, and for the purposes of this decision are here conceded. The fact remains nevertheless that every original attribute of the government of the Creek Nation still exists intact which has not been destroyed or limited by act of Congress or by the contracts of the Creek tribe itself.

Originally an independent tribe, the superior power of the republic early reduced this Indian people to a "domestic, dependent nation" (Cherokee Nation v. State of Georgia, 5 Pet. 1–20, 8 L. Ed. 25), yet left it a distinct political entity, clothed with ample authority to govern its inhabitants and to manage its domestic affairs through officers of its own selection, who under a Constitution modeled after that of the

United States, exercised legislative, executive, and judicial functions within its territorial jurisdiction for more than half a century. The governmental jurisdiction of this nation was neither conditioned nor limited by the original title by occupancy to the lands within its territory. That original Indian title was the property of the Osages. It was extinguished, and a patent was issued and delivered by the United States to the Creek Nation, which conveyed to it the title to the lands within its territory by metes and bounds "so long as they shall exist as a nation and continue to occupy the country hereby assigned to them." Chapter 148, 4 Stat. 411; 7 Stat. 366, 414. This power to govern the people within its territory was repeatedly guarantied to the Creek tribe by the United States. By the treaty of March 24, 1832 (7 Stat. 368, art. 14), the United States agreed that "the Creek country west of the Mississippi river shall be solemnly guarantied to the Creek Indians, nor shall any state or territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them." By the treaty of August 7, 1856 (11 Stat. 703, art. 15), and of June 14, 1866 (14 Stat. 788, art. 10), this guaranty was reiterated. Founded in its original national sovereignty, and secured by these treaties, the governmental authority of the Creek Nation, subject always to the superior power of the republic, remained practically unimpaired until the year 1889. Between the years 1888 and 1901 the United States by various acts of Congress deprived this tribe of all its judicial power, and curtailed its remaining authority until its powers of government have become the mere shadows of their former selves. Nevertheless its authority to fix the terms upon which noncitizens might conduct business within its territorial boundaries guarantied by the treaties of 1832, 1856, and 1866, and sustained by repeated decisions of the courts and opinions of the Attorneys General of the United States, remained undisturbed.

What, then, are the provisions of the Creek agreement of 1901 by which counsel for the complainants insist that the Creek tribe has divested itself of the power to prescribe these terms? They are that town sites were to be laid out within the territorial limits of the Creek Nation, that the lots therein were to be appraised, that noncitizens who occupied these lots were to be permitted to purchase them for one-half of their appraised value, that all lots in such town sites might be sold to purchasers without regard to citizenship, and that upon the payment of the purchase price each vendee should receive a deed from the principal chief of the nation, approved by the Secretary of the Interior. It is said that the sale of these lots and the incorporation of cities and towns upon the sites in which the lots are found authorized by act of Congress to collect taxes for municipal purposes segregated the town sites and the lots sold from the territory of the Creek Nation, and deprived it of governmental jurisdiction over this property and over its occupants. But the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it, or by the existence of municipalities therein endowed with power to collect taxes for city purposes, and to enact and enforce municipal

ordinances. Neither the United States, nor a state, nor any other sovereignty loses the power to govern the people within its borders by the existence of towns and cities therein endowed with the usual powers of municipalities, nor by the ownership nor occupancy of the land within its territorial jurisdiction by citizens or foreigners. The establishment of town sites and the organization of towns and cities within the limits of this Indian nation present no persuasive reason why any other rule should prevail in the measurement of its power to fix the terms upon which noncitizens may conduct business within its borders. The theory that the consent of a government to the incorporation and existence of cities upon its territory or to the conveyance of the title to lots or lands within it to private individuals exempts the inhabitants of such cities and the owners or occupants of such lots from the exercise of all its governmental powers, while it leaves the inhabitants of other portions of its country subject to them, is too unique and anomalous to invoke assent.

Another argument is presented in support of the claim that the owners and occupants of these lots and town sites are withdrawn from the jurisdiction of the Creek Nation. The general rule of law announced in Bates v. Clark, 95 U. S. 204, 205, 208, 24 L. Ed. 471, that all the original Indian country remains such until the Indian title to it is extinguished, and no longer, "unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case," is cited, and it is insisted that whenever a lot or tract of land was purchased of the Creek Nation, and either its title or its right of occupancy to that tract was extinguished, the governmental jurisdiction of that nation over that tract and over its owner and occupant, the application of the laws of the United States relating to intercourse with the Indians, and the authority of the Secretary of the Interior, were likewise extinguished, because that lot or tract was no longer a portion of the Indian Territory. But the case before us falls not under the rule, but under the express exception to the rule, set forth in the opinion cited. The rule applies to the extinguishment·of the original Indian title by occupancy. The case under consideration involves the extinguishment of no such title. The rule governs cases in which a different rule is not made applicable by treaty or by act of Congress. Many treaties and many acts of Congress imperatively invoke a different rule in the case in hand—the rule that the governmental power of a nation is not limited to the occupants of the lands in its country which the nation itself owns, but extends to all the inhabitants of its territory. The Creek Nation never held the original Indian title by occupancy to any of its country. It held its territory under a patent from the United States and under an act of Congress which expressly provided that it should be the country of the Creeks "so long as they shall exist as a nation and continue to occupy" it. They still exist as a nation, and they still continue to occupy that country, notwithstanding the fact that those who are noncitizens of their tribe hold the title to and occupy isolated lots and tracts of land therein. Over this country the treaties of 1832 (7 Stat. 368, art. 14), of August 7, 1856 (11 Stat. 703, art. 15), and of June 14, 1866 ,(14 Stat. 788, art. 10), guarantied the full jurisdiction of the government

of this tribe so far as the acts of its government should not be violative of the Constitution and laws of the United States. The laws enacted by its national council and the judgments of its courts when properly proved have been accorded the same faith, credit, and effect by the courts of the United States that were accorded to the laws of the states and the judgments of their courts. Mehlin v. Ice, 5 C. C. A. 403, 56 Fed. 12; Standley v. Roberts, 8 C. C. A. 305, 314, 59 Fed. 836, 845. And the Creek agreement of 1901, to which counsel appeal for exemption from the jurisdiction of the government of the Creek Nation, expressly provides that "the tribal government of the Creek Nation shall not continue longer than March 4, 1906, subject to such further legislation as Congress may deem proper," which is, in effect, a contract that it shall continue, and that it shall exercise until that time over all persons within the limits of the territorial jurisdiction assigned to it by the act of May 28, 1830 (chapter 148, 4 Stat. 411), the treaty of March 24, 1832 (7 Stat. 366), and the patent issued to it pursuant thereto, every governmental power it then possessed of which it has not been deprived by the agreement of 1901 or by some subsequent act of Congress. The treaties and agreements between the United States and the Creek Nation under which title from the United States and jurisdiction to govern its country within the limits of its patent were guarantied to it, the acts of Congress, and the decisions of the courts which have respected and sustained that jurisdiction, clearly take this case out from under the general rule that the extinguishment of the original Indian title by occupancy removes land from the Indian country, and converge with compelling force to convince the mind that neither the establishment of town sites nor the purchase nor the occupancy by noncitizens of lots therein withdraws those lots or the town sites or their occupants from the jurisdiction of the government of the Creek Nation from the application of the laws of the United States to the intercourse of the citizens and noncitizens of that tribe, or from the authority of the Secretary of the Interior, of the Indian inspector, and of the Indian agent under those laws.

This conclusion becomes irresistible when the situation of the parties at the time the Creek agreement of 1901 was made and all the provisions of that contract are carefully considered. The act of June 28, 1898 (chapter 517, 30 Stat. 495, 500, 516), had provided for the organization of municipal corporations, the selection of town sites, and the appraisement and sale of lots therein to those who were not citizens of the Indian nations. Purchasers of such lots who were not citizens of these tribes had claimed that their purchases withdrew their lots from the Indian country, and exempted their occupants from liability to pay the permit taxes of the tribes, and the Attorney General of the United States had held that this claim was unfounded; that, "if the Indian title to the particular lots sold had been extinguished, and conceding that the statute authorizes the purchase of such lots by an outsider, and recognizes his right to do so, the result is still the same, for the legal right to purchase land within an Indian nation gives to the purchaser no right of exemption from the laws of such nation, nor does it authorize him to do any act in violation of the treaties with such nation"; that merchants and traders who had purchased or were oc-

cupying such lots were liable to pay the permit taxes of the tribe, and that, if they failed or refused to do so, the power was still vested in, and the duty was still imposed upon, the Secretary of the Interior to close their business. 23 Opinions of Attorneys General, 214, 217, 219, 220. Pursuant to this decision the civilized tribes were charging, and the Indian agent was collecting, taxes from noncitizens engaged in business in these nations. It was under this state of facts that the United States and the Creek Nation made the agreement of 1901. Did they intend by that agreement that the Creek Nation should thereby renounce its conceded power to exact these permit taxes? Both parties knew that this power existed, and the United States, by the act of its President approving the law of the Creek national council, and the Secretary of the Interior by enforcing it, had approved its exercise. The subject of these taxes was presented to the minds of the contracting parties and was considered during the negotiation of the agreement, for that contract contains express stipulations that cattle grazed on rented allotments shall not be liable to any tribal tax (chapter 676, 31 Stat. 871, § 37), and that "no noncitizen renting lands from a citizen for agricultural purposes as provided by law, whether such lands have been selected as an allotment or not, shall be required to pay any permit tax" (chapter 676, 31 Stat. 871, § 39). But they made no provision that noncitizens who engaged in the mercantile business in the Creek Nation should be exempt from these taxes. As the law then in force required such noncitizens to pay such taxes, as both parties were then aware of that fact and considered the question, and as they made no stipulation to abolish these taxes, the conclusive presumption is that they intended to make no such contract, and that the power of the Creek Nation to exact these taxes, and the authority of the Secretary of the Interior and of his subordinates to collect them, were neither renounced, revoked, nor restricted, but that they remained in full force and effect after as before the agreement of 1901.

The next argument of the complainants is that the only lawful method for the enforcement of the law prescribing the permit taxes was the removal of those who violated it from the Indian Territory under section 2149 of the Revised Statutes; that the use of this method has now been prohibited by the provision of the act of May 27, 1902, which forbids the removal of any person from the Indian Territory who is in lawful possession of any lot in a town site in any town or city in that territory (chapter 888, 32 Stat. 259); and that the law prescribing the permit taxes has been thereby repealed or annulled, and the authority of the Secretary of the Interior and of the Indian agent to enforce it has been revoked. The correctness of the major premise of this syllogism is not conceded. The executive department of the government, under the advice and pursuant to the considered opinion of the Attorney General, had held, nearly two years before the act of 1902 was passed, that there was another way of enforcing this law—that is to say, by stopping its continued violation by closing the business of its violators (23 Opinions of Attorneys General, 219, 220); a holding which the Supreme Court subsequently quoted with apparent approval in Morris v. Hitchcock, 194 U. S. 384, 392, 24 Sup. Ct. 712, 48 L. Ed. 1030. The opinions of the officers of the legislative and executive de-

partments of the government upon the proper interpretation of the laws respecting subjects specially intrusted to them for management and disposition, while not controlling upon the courts, are entitled to great deference and grave consideration, especially when they are founded upon an opinion of the chief of the department of justice, and these views should not be disregarded or overruled unless it clearly appears that they are erroneous. Deming v. McClaughry, 51 C. C. A. 349, 351, 113 Fed. 639, 641; Deweese v. Smith, 45 C. C. A. 408, 414, 106 Fed. 438, 445.

It is said, however, that the closing of the business of the breakers of this law is a violation of the fifth amendment of the Constitution, in that it deprives them of life, liberty, or property without due process of law. The legal effect, however, of the law prescribing the permit taxes is to prohibit noncitizens from conducting business within the Creek Nation without the payment of these taxes. Every noncitizen who continues to trade after his refusal upon reasonable demand to pay his permit tax is a continuous violator of that law. He has no personal or property right to violate that or any other valid law. Hence the mere stoppage of that violation, the mere closing of his unlawful business and the prevention of its further continuance in the Creek Nation until he pays his tax, impinges upon no right of life, liberty, or property which he possesses.

Another objection to the prevention of the continuance of the unlawful business is that the Indian inspector, Indian agent, and Indian police have no warrant, writ, or process to close such a business. To this contention there are two answers: (1) That no process but the law, the treaties, the acts of Congress, and their commissions of office are necessary to warrant the executive officers of a government in preventing a violation of any law where that prevention impinges upon no personal or property rights of him who seeks to break it; and (2) that the law which imposes upon them the duty to collect the taxes and the rule of the Secretary of the Interior which imposes the duty upon the Indian agent to enforce this law and collect the taxes furnish sufficient process to warrant him in preventing the violation of the law. There is a wide difference between that prevention of the violation of a law which restricts no personal or property right of him who threatens to break it, and the infliction of a penalty provided for its violation which involves the seizure of the person or the property of the offender. The prevention of an unlawful business is of the former, the deportation of one who conducts it from the country is of the latter, character. The general structure of our government imposes the duty of enforcing the laws primarily upon its executive officers. A large portion of all legislation is injunctive. It forbids, and prescribes a penalty for the violation of, the inhibition. The purpose of such legislation is not the infliction of the penalties, but obedience to the law. Hence officers charged with the enforcement of such laws may lawfully interpose to prevent their violation without special writ or process where interposition infringes no personal or property right of those who seek to break them. A sheriff or a policeman who perceives one about to kill or maim another, to burn his house, to steal his property, or to do any other act prohibited by the laws of the land, which it is his duty to enforce,

is not required to wait in futile idleness until the laws have been broken in order that the prescribed penalties for their violation may be inflicted, even though those penalties are the only means specifically prescribed by the laws for their enforcement. The laws themselves and his commission of office vest in him the authority, and impose upon him primarily the duty, to prevent their violation, and thus to enforce obedience to them. He may lawfully do, and it is his duty to do, this without further warrant or process, where such action will not impinge upon the lawful rights of those who threaten the violation. Mobs gather, and threaten to destroy life and property. The laws and the commissions of their office are ample process of law to warrant mayors, Governors, the President, and all executive officers of city, state, and nation to gather their forces, if necessary, to surround the threatened persons and property, and to protect them against attack. Indeed, this is the primary duty of the executive department of the government, and it is only after executives renounce or fail to discharge this duty that an appeal may be successfully made to the courts for relief. Since in the case at bar the Indian inspector, the Indian agent, and the Indian police were the executive officers of the United States, charged with the enforcement of this law, which in legal effect forbade noncitizens to conduct business in the Creek Nation without the payment of these permit taxes, these officers had ample power, and it was their duty, without special writ or process, to prevent the continuous violation of that law by stopping the unlawful business until the taxes were paid.

Nor were these officers without special order or process sufficient in law, if such were necessary. The authority to exact license fees and taxes is a legislative power. Their levy and collection are ministerial acts ordinarily intrusted not to the courts, but to executive officers. And the legislative body which has the authority to impose the taxes is also vested with the power to designate the officers who shall collect them. Crabtree v. Madden, 54 Fed. 426, 430, 4 C. C. A. 408, 412; Meriwether v. Garrett, 102 U. S. 472, 515, 26 L. Ed. 197; Peirce v. Boston, 3 Metc. 520. The national council of the Creek Nation and the President designated by the law which conditioned the right of a noncitizen to do business in that nation with the payment of the permit tax the United States Indian agent of the Union Agency to collect the tax, and directed that upon a refusal to pay it the offender should be reported to the proper authorities for removal. This law of the Creek Nation was in legal effect a law of the United States, because it was authorized by treaties, acts of Congress, and judicial decisions of this nation. The Constitution of the United States, which was extended over the Indian Territory by act of Congress (chapter 182, 26 Stat. 81), declares (article 2, § 3) that the President "shall take care that the laws be faithfully executed." The act of May 28, 1830 (4 Stat. 412, § 6, and Rev. St. § 2114), provided that it shall and may be lawful for the President to cause such tribe or nation (referring to the Creek Nation among others) to be protected in their new residence against all interruption or disturbance from any other tribe or nation, or from any other person or persons, and to have general superintendence over them. The treaty of 1856 (11 Stat. 704, art. 18) contains the agreement that "the United States shall protect the Creeks  *  *  *  from ag-

gression by the other Indians and white persons not subject to their jurisdiction and laws." The Secretary of the Interior is empowered to direct and supervise all the public business of the United States relating to the Indians. Rev. St. § 441 [U. S. Comp. St. 1901, p. 252]. "Each Indian agent shall within his agency manage and superintend the intercourse between the Indians, agreeably to law; and execute and perform such regulations and duties not inconsistent with law as may be prescribed by the President, the Secretary of the Interior, the commissioner of Indian affairs, or the superintendent of Indian affairs." Rev. St. § 2058. In November, 1898, the Secretary of the Interior adopted and published a regulation to the effect that it was and should thereafter be the duty of the Indian agent whose acts are challenged in the case at bar to collect under the supervision of the Indian inspector of the Indian Territory permits and taxes due to this Indian tribe as provided by its laws. This regulation was the order or mandate of the secretary to this inspector and agent to enforce the law of the Creek Nation which prohibits the conduct of business of noncitizens within that nation without the payment of their permit taxes, and it constitutes a legal writ and due process of law to warrant them not only in receiving the taxes if paid, but also in closing the unlawful business of the offender, and stopping the continued violation of the law, if the payment of the taxes is refused. Judge Shiras, discussing the meaning of the term "legal writ or process," found in section 5398 of the Revised Statutes [U. S. Comp. St. 1901, p. 3655], declares the rule upon this subject with his accustomed clearness in these words:

"Whenever, by the provisions of the Constitution, or of a treaty made in pursuance thereof, or of an act of Congress, the executive department of the government is charged with the performance of some duty or obligation, and, to secure due performance thereof, it becomes necessary that certain action be taken, and the executive department, acting through the proper channel, issues a written order or mandate requiring the doing of the appropriate act, and directing a proper person to execute such mandate or command, such a writing is, in my judgment, a legal writ, within the meaning of the section of the statute now under consideration." U. S. v. Mullin (D. C.) 71 Fed. 682, 688; In re Neagle, 135 U. S. 1, 63, 10 Sup. Ct. 658, 34 L. Ed. 55.

The result is that there was no error in the view of the Attorney General and of the Secretary of the Interior that the latter and his subordinates had authority to close the business of noncitizens who refused to pay the permit taxes fixed by the laws of the Five Civilized Tribes, and that the deportation of the offenders was not the only method available for the enforcement of these laws. The conclusion necessarily follows that the prohibition of the deportation of noncitizens from the Indian Territory by the act of 1902 neither repealed nor annulled the permit laws of the tribes, nor deprived the Secretary of the Interior and the defendants of the authority to enforce them by preventing their violators from continuing their unlawful business after they had refused to pay the taxes.

The correctness of this conclusion is placed beyond doubt by a brief consideration of the circumstances under which the act of 1902 was passed, and the terms of the provision for deportation. The Attorney General and the secretary had held, as we have seen, that the latter had

authority not only to deport, but to close the business of, offenders, to stop the violation of these laws. The natural—the direct—way to strike down these permit taxes and to annul these laws was to provide in simple words that the taxes should no longer be exacted, or that the laws should no longer be enforced. But the act of 1902 contains no such provision. It does not refer to or mention the permit taxes in any way whatever, and it does not limit its prohibition of deportation to those liable to pay such taxes, but extends it to every person in lawful possession of a lot in a town site established under the acts of Congress in a town or city in the Indian Territory, whether he was liable to pay such taxes or not. The only rational inference from this legislation is that Congress never had any purpose to annul the laws of the tribes prescribing their permit taxes, or to prevent their enforcement by the passage of the deportation act of 1902, and that that act had no such effect.

The ultimate conclusion of the whole matter is that purchasers of lots in town sites in towns or cities within the original limits of the Creek Nation, who are in lawful possession of their lots, are still subject to the laws of that nation prescribing permit taxes for the exercise by noncitizens of the privilege of conducting business in those towns, and that the Secretary of the Interior and his subordinates may lawfully enforce those laws by closing the business of those who violate them, and thereby preventing the continuance of that violation.

This case has been considered and the result in it has been reached upon the assumption that since this suit was commenced the complainants have purchased and paid the entire consideration for the lot or lots in the town of Wagoner which they occupy—an assumption which we are assured by their counsel is in accordance with the fact—and in the assurance that, since the deportation of the complainants from the territory has been prohibited by the act of 1902, the defendants will not attempt to remove them. This course has been pursued at the request of counsel to prevent a multiplicity of suits in view of the fact that many controversies conditioned by similar facts are said to exist.

There are, however, other reasons why the decrees of the courts in the Indian Territory in this case are not reversible. Those decrees must be judged not by the facts or faiths which were not disclosed or were not in existence when they were rendered, but by the facts presented in the record before them and before us. The facts relative to the title of the complainants which that record presents are these only: that they were on August 23, 1901, the owners of improvements on lots in the town of Wagoner which had been appraised and listed to them, and which they intended to buy; that they were exercising the privilege of conducting mercantile business in that town without paying the permit taxes due from them under the Creek laws; and that the defendants were about to close their business, and to report them to the Secretary of the Interior for removal from the territory. There was no error in the dismissal of the bill and the refusal of the courts to enjoin the defendants upon that state of facts, because those facts disclosed no extinguishment of the title of the Creek Nation, and no withdrawal of the lots or of the town site from the Indian country, even if the general rule cited in Bates v. Clark were applicable to these lands, and be-

cause at the time the defendants threatened to close the business of the complainants and to report them to the secretary for removal from the territory the prohibition of deportation contained in the act of 1902 had not been enacted, and the defendants had lawful authority both to stop their business and to deport them from the territory. Rev. St. § 2149; 23 Opinions of Attorneys General, 219, 220; Morris v. Hitchcock, 194 U. S. 392, 24 Sup. Ct. 712, 48 L. Ed. 1030. Moreover, the bill itself disclosed all these facts, and the United States Court for the Northern District of the Indian Territory rightfully sustained a demurrer to it and dismissed the bill as early as August 27, 1901. That decree should have been affirmed. But upon an appeal the Court of Appeals of the Indian Territory erroneously reversed and remanded the case for further proceedings. Upon receipt of its mandate the defendants answered, and upon this answer and a stipulation that the averments of the bill were true the trial court again dismissed the bill, and that decree has now been affirmed by the Court of Appeals of the Indian Territory. Objection is made that the trial court erred, and that its final decree should have been reversed because that court did not obey the mandate and follow the first decision of the Court of Appeals of the Indian Territory as the law of the case. Conceding, without considering or deciding, that the trial court fell into an error here, and that for that reason the Court of Appeals of the Indian Territory should have reversed the second decree of dismissal, nevertheless its decree of affirmance is not reversible in this court because it effects the right and the inevitable result. The first decree of the Court of Appeals, which reversed the decree that sustained the demurrer, was not reviewable by appeal, because it was not a final decree. When appeal was taken to this court from the second decree of the Court of Appeals of the Indian Territory, which affirmed the decree that dismissed the bill upon the merits, all the proceedings from the inception of the suit became subject to review in this court for the first time. As prior to this time this court had never had the opportunity to review the first decision of the Court of Appeals of the Indian Territory, that decision was not the law of the case in this court. Morgan v. Thompson, 59 C. C. A. 672, 124 Fed. 203. That decision was erroneous. It was a reversal, and it should have been an affirmance. If we should now reverse the decree of dismissal which has been rendered, it would only be to direct the entry of a decree of dismissal in the same terms upon the demurrer. As a decree which has the same effect has already been entered, it will not be disturbed. A right decree for a wrong reason is not reversible.

The decrees below must be affirmed, and it is so ordered.