No. SC-CV-54-95
# Supreme Court of the Navajo Nation

---

**In the Matter of:**
**Atkinson Trading Company, Inc.,**
**Appellant.**
**Decided August 22, 1997**

---

## OPINION

Before YAZZIE, Chief Justice, AUSTIN and CADMAN, Associate Justices.

James B. Collins, Esq., Farmington, New Mexico, William J. Darling, Esq., Albuquerque, New Mexico, and Katherine M. Peck, Esq., Albuquerque, New Mexico, for the Appellant; and Marcelino R. Gomez, Esq., and Luralene Tapahe, Esq., Navajo Nation Department of Justice, Window Rock, Navajo Nation (Arizona), for the Appellee Navajo Tax Commission.

Opinion delivered by AUSTIN, Associate Justice.

In 1994, Atkinson Trading Company, Inc. (Atkinson) sought a federal district court declaratory judgment claiming that the Navajo Nation cannot impose a hotel occupancy tax on its non-Indian guests and require it to collect and remit that tax to the Navajo Nation. *Atkinson Trading Co. v. Navajo Nation*, 866 F. Supp. 506 (D.N.M. 1994). The court declined to consider that issue and properly sent the question to the Navajo Nation forum to "evaluate tribal law in light of existing federal law," trusting that "[t]here is every reason to expect that the Navajo Nation will grant plaintiff a fair, unbiased consideration of its arguments about why the Hotel Occupancy Tax should not be imposed on plaintiff's operations." *Id.* at 512.

The Navajo Tax Commission (Commission) considered Atkinson's claims and, after applying the tests in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982), and *Montana v. United States*, 450 U.S. 544, 565-66 (1981), ruled that Atkinson was subject to provisions of the Navajo Nation Hotel Occupancy Tax, to help defray the costs of Navajo Nation governmental services which benefit Atkinson and its guests. Atkinson appeals. The sole issue we address is whether Atkinson is subject to provisions of the Navajo Nation Hotel Occupancy Tax for the rental of rooms at a facility located on non-Indian fee land within the exterior boundaries of the Navajo Nation. In other words, does existing federal law preclude the Navajo Nation from applying its hotel tax to non-Navajo tourists lodging on non-Indian fee land and requiring Atkinson to collect and remit that tax?

# I

On July 30, 1992, the Navajo Nation Council enacted the Navajo Nation Hotel Occupancy Tax, 24 N.N.C. §§ 101-142 (1995), which became effective on January 1, 1993. It is imposed on all guests who rent hotel rooms within the exterior boundaries of the Navajo Nation. The hotel proprietor must collect, remit and report the tax to the Navajo Nation. 24 N.N.C. §§ 102, 104. The proprietor can keep "one percent of the amount of the tax due as shown on the return" as reimbursement for its tax collection costs. 24 N.N.C. § 109. The tax is used to promote tourism and develop tourism-related projects in the Navajo Nation. 24 N.N.C. § 142. The Commission administers the tax. 24 N.N.C. § 108.

Atkinson, a New Mexico Corporation with a principal place of business at Gallup, New Mexico, operates a facility known as the Cameron Trading Post at Cameron, Navajo Nation (Arizona), within the exterior boundaries of the Navajo Nation. The facility is located on non-Indian fee land and completely surrounded by Navajo Nation trust lands. See Act to Define the Exterior Boundaries of the Navajo Indian Reservation in Arizona and for Other Purposes, 48 Stat. 960-62 (June 14, 1934) (1934 Boundary Act). The facility caters to the tourist trade, with a hotel, restaurant, cafeteria, gallery, curio shop, retail store and recreational vehicle park. It is near the east entrance to the Grand Canyon.[1] The guests who stay at the hotel and use the facilities are primarily non-Navajo tourists. They are required to pay a tax for their room, which Atkinson must collect and remit to the Navajo Nation.[2]

The Commission found that guests are served by Navajo employees of the facility, who are 75 to 80% of Atkinson's work force. Guests get goods brought by suppliers who enter and travel across the Navajo Nation to reach Atkinson's facility. That includes Navajo arts and crafts which Atkinson buys from off-reservation sources. Atkinson stopped buying arts and crafts from Navajo artisans in 1995, apparently to avoid direct contact with Navajos and to avoid Navajo Nation regulation. A small amount of sales are made to Navajo Nation members.

The Navajo Nation Police, the primary law enforcement agency in the Cameron area, and the Navajo Nation Fire Department, protect the tourists and Atkinson's facility. Both respond to emergency calls, including 911 calls, from tourists and local residents. The police routinely patrol and perform security checks in the area, including Atkinson's facility, which benefit tourist safety and security. The police respond to accidents involving non-Indian tourists and call Navajo Nation emergency medical services for them when needed. The Navajo

---

1. We take judicial notice that the Cameron Trading Post sits near the junction of U.S. Highway 89 and Arizona Route 64, which goes to the Little Colorado River (Navajo Nation) Tribal Park and enters Grand Canyon National Park. See, Map 44, Parks and Sacred Places, James M. Goodman, _The Navajo Atlas_ 88 (1982). The record does not disclose the history of Cameron Trading Post in the area. We also take judicial notice that it is significant that the business, operating under the names "trading company" and "trading post" and headquartered in Gallup, New Mexico, is based on a long-standing history of using Indian trading posts and Navajo Indians as a lure for tourists.

2. The record does not show a tourist challenge to the tax.

Nation Division of Health protects the health of guests by inspecting food preparation conditions, not only in the Cameron area, but throughout the Navajo Nation. The Navajo Nation Tourism Department serves guests by telling them of the attractions of the Navajo Nation and provides facilities, and that function also serves Atkinson. As a general matter, the Navajo Nation government funds many kinds of activities which benefit Atkinson and its guests, including economic development ventures, human resource programs, natural resource development (including parks and scenic sites), public safety, health services, social services, education, and legislative and judicial services.

In sum, Atkinson and Cameron, as an (Indian) trading "company" or "post," operate in a Navajo environment and use Navajo trappings to lure tourists. Those tourists and the facility benefit from a wide range of Navajo Nation governmental services.

## II

At the outset, Atkinson concedes that anyone lodging on trust lands and Navajo Nation members lodging on non-Indian fee lands can be charged a Navajo Nation hotel tax. Appellant's Brief at 6. But as to non-members renting rooms on non-Indian fee lands, Atkinson claims that the Navajo Nation has no power to impose its hotel tax or require non-member businesses to collect and remit that tax. Apparently, Atkinson is willing to collect and remit the tax if it is imposed on Navajo Nation members only at its facility.

Atkinson has resisted regulation as an entity doing business in Indian Country before. In *Ashcroft v. United States*, 679 F.2d 196 (9th Cir. 1982), Atkinson (then an Arizona corporation and doing business as Gilbert Ortega's Cameron Trading Post) opposed federal regulation as an Indian trader under the Indian Trader Statutes, 25 U.S.C. §§ 261-264. There, as here,[3] Atkinson claimed that its lands "either existed before the creation of the [Navajo] Reservation or were withdrawn from the reservation after its creation." *Ashcroft*, 679 F.2d at 198, n.1. Therefore, Atkinson claimed the United States had no authority to regulate its trade on fee land within the exterior boundaries of an Indian reservation because it was "not *on* the reservation."[4] *Id.* at 198 (emphasis added). The court disagreed, finding that federal business regulations defining on-reservation activities, and the doctrine of inherent tribal sovereign power proclaimed in several

---

3. Atkinson says its fee land resembles a donut: "Clearly, the hole in the center of a donut is not a part of the donut and here Congress carved out a hole in tribal jurisdiction when it extended the boundaries of the Navajo Reservation to surround Cameron Trading Post." Appellant's Brief at 14.

4. The Commission rejected the contention that rulings in the *Ashcroft* decision bound its decision under preclusion doctrines of res adjudicata or collateral estoppel because the issues in the federal case were different. On appeal, the Commission invites us to apply those preclusion doctrines. Without deciding that question, we prefer to address the merits raised by Atkinson

United States Supreme Court decisions,[5] compelled a ruling that business activities conducted on fee land within the exterior boundaries of a reservation were in fact "on" reservation conduct which could be regulated by either the United States or an Indian nation. *Id.* at 199-200. The court explained that "Indian tribes retain inherent sovereign power to act in accordance with the authority recognized in this regulation with respect to all land within the exterior boundaries of the reservation whether it be fee patent, tribal or trust property." *Id.* at 199, n.2.

The General Allotment Act of 1887, 24 Stat. 388 (February 8, 1887), was one of the most oppressive and destructive pieces of Indian legislation ever enacted by Congress. It stripped Indian nations of at least two-thirds of their land base and forced many Indian people into hopelessness and destitution. Congress recognized its mistake and passed the Indian Reorganization Act of 1934 (IRA), 48 Stat. 984-88 (June 18, 1934), which, among other things, ended the allotment policy. Section 5 of the IRA authorizes the Secretary of the Interior to acquire lands and land rights "for the purpose of providing land for Indians," and section 7 authorizes the Secretary to "add ... lands to existing reservations."[6] The Navajo People reserved to themselves a minute portion of their aboriginal homelands in the 1868 Navajo Treaty, 15 Stat. 667 (June 1, 1868). The 1868 Treaty is significant here for two reasons: it defines the original Navajo Reservation (an "existing reservation" referred to in section 7 of the IRA), and it proclaims the Navajo Nation's retained inherent sovereign authority over the exterior boundaries of its territory — then and now.

In 1934, Congress, anticipating that the IRA would restore land to existing Indian reservations and correct the abuses of the General Allotment Act, passed the 1934 Boundary Act "[t]o define the exterior boundaries of the Navajo Indian Reservation in Arizona...." 48 Stat. 960. The 1934 Boundary Act brought the Cameron area back into the territorial jurisdiction of the Navajo Nation, and included the subject fee land within the exterior boundaries of the Navajo Nation. Therefore, Atkinson's facility is located within Navajo Indian Country, which is defined as follows:

> The territorial jurisdiction of the Navajo Nation shall extend to Navajo Indian Country, defined as all land within the exterior boundaries of the Navajo Indian Reservation or of the Eastern Navajo Agency, all land within the limits of dependent Navajo Indian Communities, all Navajo Indian allotments, and all other land held in trust for, owned in fee by, or leased by the United States to the Navajo Nation or any Band of Navajo Indians.

7 N.N.C. § 254 (1995).

---

5. *Montana v. United States*, 450 U.S. 544 (1981); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982); *Kennerly v. District Court*, 400 U.S. 423 (1971); and *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463 (1976).

6. To restate the obvious, the term "reservation" means lands "reserved" by Indian nations or their homelands. It does not mean (at least in the Navajo Nation context) a generous gift from the United States.

This definition of Navajo Indian Country is derived from the federal statutory definition of "Indian Country," 18 U.S.C. § 1151.[7] Navajo Nation Council Resolution No. CMY-28-70 (May 7, 1970). In *Ashcroft*, the court applied federal regulatory definitions of what it means to be "on" an Indian reservation or within Indian Country, and concluded that Atkinson was indeed doing business "on" the Navajo Reservation or within Navajo Indian Country. 679 F.2d at 198-200.

Indian Country includes "all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151 (a). The Indian Country statute is the measure of tribal civil authority. *See DeCoteau v. District County Court*, 420 U.S. 425 (1975); *Pittsburgh & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531 (10th Cir. 1995). The Tenth Circuit Court of Appeals held in *Watchman*: The Indian Country statute "represents an express Congressional delegation of civil authority over Indian country to the tribes." 52 F.3d at 1541. Consequently, the court found that "the Navajo Nation has the authority to tax any mining activities taking place in Indian country without violating any express [federal] jurisdictional prohibitions." 52 F.3d at 1541. Accordingly, Atkinson's fee land is in the Navajo Nation, and its business activities, including the renting of hotel rooms to non-Indian tourists, takes place within Navajo Indian Country.

## III

Despite Atkinson's physical presence within the Navajo Nation, as well as the entry of non-Navajo tourists,[8] does the Navajo Nation have the lawful power to tax guests or require Atkinson to collect that tax? The Navajo Nation enjoys governmental authority over its territory, as does any sovereign. The federal courts have agreed, particularly with respect to Indian nation taxing power. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 ("there is a significant territorial component to tribal power ... [including]... Indian taxing power...."); *Buster v. Wright*, 135 F. 947, 950 (8th Cir. 1905), *appeal dismissed*, 203 U.S. 599 (1906) (a tribe may prescribe the terms upon which non-Indians conduct business within its borders). Thus, the general principle is Indian nations have the inherent power to tax using their general governmental authority, except to the extent congress has expressly limited that power, and that governmental authority includes taxation of non-Indians who are present within Indian Country. Felix S. Cohen, *Handbook of Federal Indian Law* 431-35 (1982 ed.); *Washington v. Confederated Tribes*, 447 U.S. 134, 152-54 (1980).

In 1893, a federal appeals court considered the issue of whether the Creek

---

7. The United States Supreme Court has held that this federal criminal jurisdiction statute "generally applies as well to questions of civil jurisdiction." *De Coteau v. District County Court*, 420 U.S. 425, 427 n.2 (1975).

8. Non-Indians are not permitted to "pass over, settle upon, or reside in" the Navajo Nation without proper authorization pursuant to Article II of the 1868 Navajo Treaty.

Nation could use the federal courts to collect a tax it imposed on a non-Indian resident of its territory. *Crabtree v. Madden*, 54 F. 426, 428 (8th Cir. 1893). While the question of the Indian nation's authority to tax non-Indians was not before it, the court noted a "presumption" that the Creek Nation lawfully imposed its tax and had the lawful authority to collect the tax using its own remedies. *Id.* at 429. The same court ruled in a subsequent case that Indian nations have inherent authority to tax non-Indians present and doing business within its territory. *Buster v. Wright*, 135 F. 947, 950, 958.[9] There, the Creek Nation imposed a permit tax on non-Indians doing business on non-Indian fee land within the Nation's territory. *Id.* at 949-950. The court affirmed the Creek Nation's power to tax:

> The authority of the Creek Nation to prescribe the terms upon which noncitizens may transact business within its borders did not have its origin in act of Congress, treaty, or agreement of the United States. It was one of the inherent and essential attributes of its original sovereignty. It was a natural right of that people, indispensable to its autonomy as a distinct tribe or nation, and it must remain an attribute of its government until by the agreement of the nation itself or by the superior power of the republic it is taken from it.

*Id.* at 950.

On the question of the Creek Nation's jurisdiction over the non-Indian lots, the court said, "the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it, or by the existence of municipalities therein endowed with power to collect taxes for city purposes...." *Id.* at 951. That is because:

> Neither the United States, nor a state, nor any other sovereignty loses the power to govern the people within its borders by the existence of towns and cities therein endowed with the usual powers of municipalities, nor by the ownership nor occupancy of the land within its territorial jurisdiction by citizens or foreigners.

*Id.* at 952. Despite non-Indian arguments that their businesses could not be taxed because the lots and town sites had been withdrawn from Creek Nation jurisdiction, the court applied the rule that "the governmental power of a nation is not limited to the occupants of the lands in its country which the nation itself owns, but extends to all the inhabitants of its territory." *Id.* at 952. Unlike the Navajo Nation, the Creek Nation acquired its lands by "a patent from the United States," but the court deemed irrelevant the method of acquisition, because the Nation had full jurisdiction over those lands as guaranteed by its treaties with the United States. *Id.* at 952-53.

The United States Supreme Court decided the issue of the Indian nations' power to tax non-Indians in *Washington v. Confederated Tribes*, 447 U.S. 134.

---

9. It is important to the issue before us that the United States Supreme Court cited *Buster v. Wright*, *id.*, as authority in *Washington v. Confederated Tribes*, 447 U.S. 134, 153 (a case dealing with tribes' power to tax non-Indians), and *Montana v. United States*, 450 U.S. 544, 566 (a case deciding the issue of a tribe's power over non-Indian conduct on non-Indian fee land within the borders of a reservation).

There, the State of Washington contended that the Colville, Makah, and Lummi Nations had "no power to impose their cigarette taxes on nontribal purchasers." *Id.* at 152. The Court disagreed:

> The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status.[10]

*Id.* (citation omitted). Although fee lands were not implicated, it is significant that the Court used a historical approach to conclude that "federal law to date has not worked a divestiture of Indian taxing power." *Id.* at 152. The Court bolstered its decision by citing with approval 1881, 1855 and 1900 Attorney General opinions and consistent Executive Branch recognition of Indian nations' power to tax. *Id.* at 152-53. The Court also concluded that the power to tax, including the taxation of non-Indians, was a power under "existing law" confirmed by section 16 of the IRA. *Id.* at 153. Moreover, the Court approved a 1934 Interior Department Solicitor's opinion, *Powers of Indian Tribes*, 55 ID 14, 46 (1934), which concluded as follows:

> Chief among the powers of sovereignty recognized as pertaining to an Indian tribe is the power of taxation. Except where Congress has provided otherwise, this power may be exercised over members of the tribe *and over nonmembers*, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions.

477 U.S. at 153 (emphasis in original).

One remaining question was the source of Indian nation taxing power: Did it hinge upon the power to exclude nonmembers from the tribe's territory or was it an inherent sovereign power? That issue was resolved in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 136-37, where the tribe imposed an oil and natural gas severance tax upon non-Indian owned oil firms that had obtained long term drilling leases for tribal land. The Supreme Court said, "[w]e disagree with the premise that the power to tax derives only from the power to exclude." *Id.* at 137. The Court elaborated:

> The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-goverment and territorial management. This power enables a tribal government to raise revenues for its essential services. The power does not derive solely from the Indian tribe's power to exclude non-Indians from tribal lands. Instead, it derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring con-

---

10. The "trust lands" qualifier is irrelevant to our case, because the court in *Ashcroft*, 679 F.2d at 200, relied on *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 478 (Montana could not tax fee land within reservation because "checkerboard jurisdiction" would result, which is contrary to statutory Indian jurisdiction law), to reject Atkinson's claims linking Navajo Nation authority solely to "Indian" lands.

tributions from persons or enterprises engaged in economic activities within that jurisdiction.

*Id.* (citation omitted).

Several significant general principles on Navajo Nation taxing power can be gleaned from these Indian nation taxation cases: 1) the Navajo Nation's power to tax is an essential and inherent attribute of its original sovereignty and that power remains intact until divested by federal law; 2) the Navajo Nation's taxing power extends over its territorial jurisdiction (Navajo Indian Country), which includes trust land, allotments and fee lands; and 3) the Navajo Nation's power to tax extends to all persons who enter its territorial jurisdiction, including over nonmembers who engage in activities, economic or otherwise, within that jurisdiction. We now turn to Atkinson's argument that the Navajo Nation does not have the power to "tax transactions between nonmembers on fee lands and to require nonmember businesses to collect and remit such taxes." Appellant's Brief at 6.

## A

The United States Supreme Court recently ruled that *Montana v. United States*, 450 U.S. 544, provides the controlling rule of law for deciding issues similar to the one before us. *Strate, et al. v. A-1 Contractors, et al.*, 520 U.S. 438, 137 L. Ed. 2d 661 (1997). The Court summarized *Montana's* general rule as follows:

> [A]bsent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare.

*Id.* at 446.

Relying on Montana, *Atkinson* argues that language in section one of the 1934 Boundary Act "expressly limited Navajo control" over its fee land. That language states as follows: "All valid rights and claims initiated under the public land laws prior to approval hereof involving any lands within the area [the Arizona portion of the Navajo Indian Reservation] so defined shall not be affected by this Act." We disagree with Atkinson. Congress must clearly and unequivocally state in a federal statute that it has divested an Indian tribe of its retained inherent sovereign power. See *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976); *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 702 (1st Cir. 1994). Nowhere in the 1934 Boundary Act has Congress unequivocally expressed its intent to divest the Navajo Nation of its inherent taxing power. The United States Supreme Court's conclusion in *Washington v. Confederated Tribes* still rings true today: "The widely held understanding within the Federal Government has always been that federal law to date has not worked a divestiture of Indian taxing power." 447 U.S. at 152. Also, a proper respect both for

Navajo Nation sovereignty and Congress' special power in this area rejects any implication that the 1934 Boundary Act implicitly divested the Navajo Nation of its inherent taxing power. *Merrion,* 455 U.S. at 149-152.

The language in the 1934 Boundary Act that Atkinson relies on does nothing more than reserve the proprietary rights of the fee holders upon expansion of the Navajo Indian Reservation. The language does not contain any special restriction on Navajo Nation governmental power, except to protect the preexisting rights of fee patent holders. *Ashcroft* put it aptly: "This would appear to mean simply that the tracts [non-Indian fee lands within the Navajo Nation] are neither tribal nor trust property. There is no indication in the record that the tracts in question differ in any way from other non-Indian fee land within a reservation." 679 F.2d at 198, n.1. Atkinson's fee land is undistinguishable from other non-Indian fee land within Indian reservation boundaries which other cases have found to be under tribal civil jurisdiction. *See, e.g., United States v. Mazurie,* 419 U.S. 544 (1975).

B

*Montana's* rule that the Court summarized in *Strate* is this:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. (citations omitted). A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. at 565-66 (citations omitted).

*Montana's* rule instructs that Indian nations "retain inherent sovereign power" over non-Indian conduct on non-Indian fee land within the borders of an Indian nation if the non-Indian "enter[s] consensual relationships with the tribe or its members." 450 U.S. at 565. The Court in *Strate* listed several cases which it said qualified under the consensual relationships exception. 520 U.S. at 457. Two of those cases bear directly on the case before us. The first case, *Buster v. Wright,* 135 F. 947, has facts remarkably similar to ours.[11] There the Choctaw Nation

---

11. Atkinson argues that *Buster v. Wright, id.,* does not support the Commission's decision because, unlike the Navajo Nation, the Creek Nation had not yet lost its inherent right to exclude nonmembers from its reservation. Therefore, the Creek Nation could condition entry and conduct of business on the reservation on the non-member's agreement to pay a reguired license fee. Appellant's Supplemental Brief at 8. Atkinson's argument is faulty. The Creek Nation, a tribe that did not own aboriginal lands in the Indian territory in the first place, was without power to exclude anyone who was in lawful possession of any parcel of land within any town site on its reservation. 135 F. at 950, 952. This lack of power was immaterial because the Creek Nation's authority to tax business transactions within its borders derived from itse inherent and original sovereignty. *Id.*

imposed a permit tax on non-Indians conducting business on non-Indian fee lands within the Nation's jurisdiction. The court ruled that the Creek Nation had the inherent sovereign power to tax and prescribe the terms upon which non-Indians may conduct business within its borders. Apparently, the non-Indians met the consensual relationships exception when they accepted the privilege of doing business within the Creek Nation's borders. In the second case, *Washington v. Confederated Tribes*, 447 U.S. 134, non-Indians entered consensual relationships with the tribes or their members when they entered the Nations' jurisdiction to purchase tobacco products from tribal vendors. The Court found the tribal interest in raising revenues for essential governmental services "strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and *when the taxpayer is the recipient of tribal services*." 447 U.S. at 156-157 (emphasis ours). The Court elaborated on what it means to be the recipient of tribal services and the concomitant need of tribes to raise revenue to fund those services in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137-138. The Court found Indian nation taxing power essential "to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction." *Id.*

Read closely, these three cases reveal a nexus between the non-Indian activity to be taxed and the Indian nation imposing the tax. Thus, to decide whether our case qualifies under *Montana's* consensual relationships exception, we ask whether Atkinson and its guests, both of whom transact business within Navajo Nation jurisdiction, receive benefits from the Navajo Nation government "for which it may be taxed." *Burlington Northern R.R. v. Blackfeet Tribe*, 924 F.2d 899, 904 (9th Cir. 1991). Stated another way, did Atkinson avail itself "of the substantial privilege of carrying on business" within the Navajo Nation, or did Atkinson and its guests "benefit from the provision of police protection and other governmental services, as well as from the advantages of a civilized society" that are assured by the Navajo Nation government? *Merrion*, 455 U.S. at 137-138 (internal quotation marks omitted). The facts in the record demand an affirmative answer.

Just like the non-Indians in *Buster v. Wright*, 135 F. 947, our case's facts show that Atkinson has availed itself of the substantial privilege of carrying on business within Navajo Nation jurisdiction. Atkinson's facility is located and operates within Navajo Nation jurisdiction or Navajo Indian Country. These facts are bolstered by the federal court's ruling that Atkinson is subject to federal laws regulating trade with Indians on Indian lands, because it operates on the Navajo Nation as an Indian trader. *Ashcroft*, 679 F.2d 196. Atkinson uses a Navajo Indian environment, including culture, Navajo employees, crafts, and other Navajo Indian trappings, to lure tourists to its facility for business purposes. While on Atkinson's property, the tourists are served by Navajo employees, who make up a majority of Atkinson's work force, to provide a distinctly Navajo flavor.

Suppliers enter and drive across the Navajo Nation to bring Atkinson and its guests goods, because Atkinson has accepted the privilege of doing business on the Navajo Nation.

Moreover, a non-Indian was held to have met the consensual relationships exception simply by engaging in commercial activity with tribal members. *Cardin v. De La Cruz*, 671 F.2d 363, 366 (9th Cir. 1982). Here, Atkinson has purchased arts and crafts from Navajo tribal members and sales have been made to tribal members. Furthermore, Atkinson has even suggested that it might be subject to Navajo Nation labor laws because it employs a large number of Navajo tribal members. Appellant's Brief at 19.

Atkinson and its guests receive and benefit from many modern Navajo Nation governmental services, or from the advantages of a civilized society that are assured by the Navajo Nation government. The Navajo Nation police respond to calls from Atkinson's guests and the Cameron Trading Post and perform routine security checks on Atkinson's facility. The Navajo Nation Fire Department responds to alarms and calls from Atkinson's guests and the Cameron Trading Post. The Navajo Nation Emergency Medical Services provides medical services to Atkinson's guests when needed. The Navajo Nation government provides other services to Atkinson and its guests including health protection through the Navajo Nation Division of Health, tourism services through the Navajo Nation Tourism Department, and as a general matter economic ventures, human resource programs, natural resource development, public safety, health services, social services, education, and legislative and judicial services.

Accordingly, we hold that the facts of this case qualify it under *Montana's* consensual relationships exception. "Under these circumstances, there is nothing exceptional in requiring [Atkinson and its guests] to contribute through taxes to the general cost of [Navajo Nation] government." *Merrion*, 455 U.S. at 138-39 (citations omitted).

The other minor issue we address is the contention that somehow tourists and Atkinson are "just passing through" and the Navajo Nation has no material interest in that activity which would justify taxation. That argument was raised in *Burlington Northern R.R.*, 924 F.2d at 902, where the Blackfeet Nation imposed a possessor interest tax upon a railroad which had a statutory right-of-way through the Nation. The court dismissed the claim finding that the Nation had a significant interest because "Burlington is the recipient of tribal services." *Id.* at 904. Nothing further need be said on this minor issue.

## C

The *Strate* decision reiterated the second *Montana* test for civil jurisdiction, namely there is tribal civil jurisdiction aside from consent where the non-Indian's conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 520 U.S. at 457, 137 L.Ed. 2d at 678 (internal quotations and citations omitted). The conduct need

only "threaten" those Indian nation interests. What then are the Navajo Nation's political integrity, economic security, and health and welfare interests with regard to an Indian trading post and associated hotel operating within Navajo Indian Country?

Taxation, that indispensable element of any government, surely has everything to do with the Navajo Nation's political integrity. A sovereign nation that cannot raise revenues to conduct governmental operations cannot function. Aside from the need to raise revenue to fund essential governmental services, *Merrion*, 455 U.S. at 137, taxation is a method of business regulation. A hotel occupancy tax is utilized to determine and project the number of tourist visits each year. Funds are then channeled to those governmental programs which benefit tourists, including police and fire protection, medical treatment, health inspections, tourism information, tourist facilities, and others.

The economic security element is similar. The Navajo Nation is seeking self-reliance and economic security through taxation. The present national trend is to shift the financial obligations of governance and government services from the federal government to the states. Public services which were formerly provided by the federal government are now the states' responsibility. The states can readily assume those obligations because of their strong tax bases. Unlike the states, the Navajo Nation just recently began building its tax base, and the hotel occupancy tax contributes to that foundation.

The Navajo Nation's health and welfare interests are also implicated. The Navajo Nation assumed the responsibility of the Indian Health Service to assure public health in the form of housing code regulation, health inspections, and providing public health services to Atkinson's guests. The "welfare" interest is used here in the sense of protecting the public welfare, as has been previously elaborated in this opinion.

The second *Montana* exception also implicates Indian nation police power. Navajo Nation police power is the power to:

> adopt such laws and regulations as tend to prevent the commission of fraud and crime, and secure generally the comfort, safety, morals, health, and prosperity of its citizens by preserving the public order, preventing a conflict of rights in the common intercourse of the citizens, and insuring to each an uninterrupted enjoyment of all the privileges conferred upon him or her by the general laws.

*Black's Law Dictionary* 1041 (5th ed. 1979). Cameron, Navajo Nation (Arizona) is not a "hole" within Navajo Nation territorial jurisdiction. The Navajo Nation has responsibilities to everyone who is present within its jurisdiction. The 1868 Navajo Treaty, in Article II, reserves authority to the Navajo Nation to admit non-Navajos or not and the United States specifically agreed that no person (with certain exceptions) "shall ever be permitted to pass over, settle upon, or reside

in" the reservation. If we were to accept Atkinson's argument that the Navajo Nation lacks power over it and its guests, that would compromise the "pass over" authority reserved in the Treaty. Congress chose to add the area which includes Cameron to the Navajo "Reservation" in 1934, so all the provisions of the 1868 Treaty apply to that area.

## IV

The Navajo Nation Hotel Occupancy Tax generally applies to the class of hotel-keepers within the Navajo Nation. There is no justifiable reason to exclude Atkinson's facility from the tax. It would not be fair to other places of lodgings to exclude Atkinson while it accepts all the benefits of Navajo Nation governmental services without paying its fair share of the cost. We conclude that the incidence of the Navajo Nation Hotel Occupancy Tax is primarily upon tourists within Navajo Indian Country; there is no explicit federal prohibition against taxing Atkinson's non-Indian guests; and the Navajo Nation has the power and authority to require Atkinson to collect and remit the tax. We affim the decision of the Navajo Tax Commission.